JOSEFA CANDAL de LÓPEZ y su esposo ERNESTO LÓPEZ, demandantes y apelantes, *v.* SOCIEDAD ESPAÑOLA de AUXILIO MUTUO y BENEFICENCIA, demandada y apelada.

No. 3971.—*Visto:* Enero 20, 1927. *Resuelto:* Marzo 16, 1928.

1. PATRONO Y EMPLEADO—RESPONSABILIDAD POR DAÑOS A TERCERAS PERSONAS— ACTOS U OMISIONES DEL EMPLEADO—RESPONSABILIDAD DEL PATRONO—INSTITUCIONES BENÉFICAS.—Los dueños y directores de un hospital privado, que

ha sido organizado y funciona sin fin pecuniario alguno, no pueden razonablemente hacerse responsables de los daños causados por la negligencia en el diagnóstico y tratamiento de un enfermo, por parte de un médico-cirujano que ha sido seleccionado después de haberse hecho una investigación detenida de su habilidad profesional, experiencia y reputación, y puesto en la dirección de tal institución.

2. PATRONO Y EMPLEADO—RESPONSABILIDAD POR DAÑOS A TERCERAS PERSONAS—ACTOS U OMISIONES DEL EMPLEADO—RESPONSABILIDAD DEL PATRONO—INSTITUCIONES BENÉFICAS.—El mero hecho de que en un solo caso a un paciente se le cobrara un precio módico por una habitación en un hospital benéfico y un precio razonable por ciertas radiografías, no es suficiente para convertir a una institución benéfica en un establecimiento o empresa comercial.

3. APELACIÓN Y ERROR—REVISIÓN — CUESTIONES DISCRECIONALES — CONDENA EN COSTAS—EN GENERAL.—Aunque generalmente, en ausencia de un señalamiento de error no debe alterarse un pronunciamiento de costas, sin embargo cuando las circunstancias del caso son peculiares y excepcionales y la cuestión principal envuelta era enteramente discutible, procede modificar la sentencia a ese respecto no permitiendo que subsista tal pronunciamiento.

SENTENCIA de *M. Rodríguez Serra*, J. (San Juan, Segundo Distrito), declarando sin lugar la demanda, con costas. *Modificada* en el sentido de que lea sin especial condena de costas, y así modificada, *confirmada.*

*R. Cuevas Zequeira,* abogado de los apelantes; *Leopoldo Feliú,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

Josefa Cancel de López y su esposo Ernesto López entablaron pleito de daños y perjuicios que alegaron haberles sido ocasionados en virtud de diagnóstico y tratamiento erróneo y negligentes (*malpractice*) de una fractura intracapsular del fémur, por un especialista en rayos X empleado por la demandada, y por el médico-cirujano a cargo del hospital de dicha demandada.

Los demandantes apelan de una sentencia declarando sin lugar la demanda, después de celebrarse un juicio sobre los méritos del caso. El octavo señalamiento es que la corte inferior erró al desestimar la acción. En vista de que existen razones que hacen que la confirmación de la sentencia sea inevitable, otras cuestiones sometidas en el alegato de los apelantes no necesitan ser expuestas ni discutidas.

[1, 2] El párrafo inicial de la demanda contiene una ale-

gación al efecto de que la demandada es una asociación organizada con fines de beneficencia y de auxilio mutuo entre sus socios, de acuerdo con la Ley de Asociación de 1887, y que con tal carácter sostiene un sanatorio con departamentos de cirugía y radiografía conocido con el nombre de "Sanatorio del Auxilio Mutuo," que además de prestar atención médica y quirúrgica a los socios, constituye una clínica general abierta al público, donde se diagnostican y tratan, mediante compensación pecuniaria, toda clase de dolencias físicas.

La corte inferior declaró sin lugar una excepción previa de falta de hechos suficientes para determinar una causa de acción, y la misma cuestión fué levantada por el abogado de la apelada durante la vista del presente recurso de apelación.

La demandada en su contestación admitió los hechos alegados en los párrafos 1 y 2 de la demanda, y en adición a ellos, por vía de alegación afirmativa, indicó que en todo momento alegado en la demanda como posteriormente, también había curado un número considerable de pacientes insolventes, suministrándoles gratuitamente hospitalización, medicinas y los servicios profesionales de sus médicos y enfermeras.

La demandada también presentó como prueba una copia certificada de los artículos 1 al 7, inclusive, de su Reglamento radicado en la Secretaría Ejecutiva de Puerto Rico. Del primero de estos artículos aparece que los fines para los cuales se constituyó la Sociedad Española de Auxilio Mutuo y Beneficencia fueron:

"1. Fomentar la unión entre los españoles y sus descendientes, sostener sus sentimientos religiosos, ejercer la caridad y mutuo auxilio.

"2. Atender con especial esmero y paternal solicitud, en los casos de enfermedad o desgracia que comprenda la índole de esta Sociedad a sus asociados y españoles indigentes.

"3. Proporcionar con sus recursos a los asociados españoles, que

carezcan de medios para hacerlo de su cuenta, la traslación a España, en aquellos casos de enfermedad que fuere necesario para su curación, de acuerdo con el dictamen médico.

"4. Rendir el último tributo a sus asociados en caso de fallecimiento, en el Establecimiento Sanitario de la Sociedad y al que falleciendo fuera de aquél sea español pobre, dándoles a unos y a otros sepultura con la solemnidad y decoro debidos. Y,

"5. Auxiliar o socorrer por una sola vez con un donativo a las familias de los finados que se hallen verdaderamente necesitadas . . . ."

El segundo de estos artículos dispone el establecimiento de un sanatorio y centro de consultas; el tercero especifica que el edificio destinado a la asistencia de los socios enfermos contendrá departamentos donde se prestará asistencia a los españoles indigentes que en caso de enfermedad lo soliciten. El cuarto autoriza la admisión de pacientes pudientes sobre la base de una tarifa fija. El quinto determina ciertos privilegios para los miembros de las tripulaciones de los buques que se inscriban mientras estén en la bahía, bajo ciertas condiciones que igualmente están fijadas por la tarifa. Los artículos sexto y séptimo establecen las reglas que gobiernan algunas de las materias que acabamos de enumerar. Las fuentes de ingreso, según el Reglamento lo indica, son: 1º, cuotas de entrada y cuotas mensuales de los socios; 2º, ingresos extraordinarios, en los que se intentó incluir, aparentemente, las sumas cobradas a los pacientes pudientes admitidos en el hospital y a los buques que hagan uso de los privilegios concedidos a su tripulación mientras estén surtos en puerto; y, 3º, los donativos de las personas que simpaticen con el movimiento.

La suma de $130 pagada a la demandada por Ernesto López por servicios prestados durante el tiempo que su esposa Josefa Candal de López estuvo recluida en el hospital, según lo indica el recibo presentado como prueba por los demandantes, sólo cubre dos partidas, a saber:

15 estancias en el Sanatorio, a $6_____  $90.00
2 radiografías de la cadera_____  40.00
                                             _____
                                             $130.00

Nada hay que demuestre la ubicación o naturaleza de la alcoba asignada a la esposa y ocupada por ella, o el costo o calidad de los alimentos consumidos por ella, o la clase de enfermeras que le fueron proporcionadas, si eran o no eficientes y hábiles. Y mucho menos hay algo que demuestre el valor real y verdadero de los alimentos o servicios últimamente mencionados. En ausencia de tal prueba, no tenemos motivo alguno para asumir que pudiera haberse obtenido acomodo similar por un precio aproximadamente igual o parecido en cualquier hospital privado que funcione en la Isla de Puerto Rico con fines pecuniarios. Ernesto López no pudo recordar lo que había pagado a otros dos especialistas en rayos X por radiografías posteriores de la cadera, pero creyó que había pagado a razón de $15 o $20 por cada una de tales radiografías. Los estados de cuenta o recibos por estos pagos posteriores que el testigo admitió estaban en su poder, nunca fueron presentados como prueba. En el momento del juicio, sólo presentó su cuenta uno de los tres médicos en ejercicio que practicaron un examen final e independiente de la paciente, unos once meses después de haber ella salido del hospital. El montante de esa cuenta era diez dólares.

Evidentemente, la cuenta del hospital no incluye cargo alguno, ya sea por el examen fluoroscópico hecho por el especialista en rayos X en la tarde en que la paciente llegó al Sanatorio, o por un examen completo de la enferma que se dijo habérsele hecho al día siguiente por el médico-cirujano correspondiente y por otro médico del hospital. La tarifa de precios contenida en el reglamento no fué presentada en el juicio, y no hay prueba ora de la intención de cobrar por servicios médicos, diagnósticos o tratamientos en el presente caso, o de que existiera tal costumbre o práctica de parte de la demandada.

Como cuarta defensa, separada e independiente, la demandada alegó:

"Que es y era en las fechas a que se refiere la demanda enmendada, una asociación de auxilio y beneficencia mutuos, que no tenía ni tiene, ni ha tenido nunca por objeto o finalidad el lucro ni la ganancia, ni para sí, ni para sus asociados o miembros, sosteniéndose por la mutua cooperación económica de sus asociados; constituida y que funciona con arreglo a la ley que se cita en la demanda enmendada."

Como quinta defensa, separada e independiente, la demandada insistió en que la demanda enmendada no aducía hechos suficientes para determinar una causa de acción.

Como sexta defensa, separada e independiente, la demandada alegó:

"Que ninguno de los médicos que se mencionan en dicha demanda enmendada, doctores Roldán y Soto Rivera, eran empleados de la demandada en las fechas a que se refiere la dicha demanda, y que los mismos desempeñaban sus funciones profesionales y técnicas en sus respectivos cargos, independientemente y sin intervención alguna de la demandada y sus directores."

Los artículos 67 al 71, inclusive, del Reglamento de la demandada, leen como sigue:

"Artículo 67.—Los establecimientos de la Sociedad estarán dotados del personal facultativo que la Junta Directiva acuerde.

"Artículo 68.—Todos los empleados subalternos de los establecimientos de la Sociedad estarán bajo la inmediata dirección del Director facultativo del respectivo establecimiento. El Director facultativo dispondrá todo cuanto juzgue conveniente en el orden científico y administrativo del establecimiento a su cargo, dando cuenta al Presidente cuando los asuntos o modificaciones sean de notoria entidad a fin de que éste apruebe o resuelva lo que en su sentir juzgue necesario.

"Artículo 69.—El Director facultativo de cada uno de los establecimientos de la Sociedad propondrá a la Junta Directiva el aumento o disminución del personal necesario, según lo reclamen las circunstancias del buen servicio o economía: igualmente propondrá los ascensos, recompensas o suspensiones a que dichos empleados se

hayan hecho acreedores en virtud de su comportamiento en el desempeño de sus cometidos.

"Artículo 70.—Las solicitudes e instancias que los empleados subalternos presenten, deberán ser dirigidas por conducto del Director facultativo del establecimiento en que preste sus servicios al Presidente de la Comisión de Organización e Inspección quien resolverá por acuerdo de su comisión, si el objeto estuviere dentro de sus atribuciones, y de no con su informe dará cuenta a la Junta Directiva para que acuerde lo que proceda.

"Artículo 71.—Cuando a juicio del Director facultativo de cualquiera de los Establecimientos de la Sociedad, alguno de los enfermos a su cuidado, necesitare de operación quirúrgica o que su enfermedad le ofreciere dudas, llamará en consulta a los demás médicos de la Sociedad; si entre ellos existiere disparidad de pareceres o considerasen necesario el concurso de algún otro médico que no pertenezca a la Asociación llamará inmediatamente a su seno al Presidente de la Sociedad, acordándose entonces lo que juzguen necesario."

Otra alegación afirmativa contenida en la contestación era la siguiente:

"Que, conforme a sus propias reglas y práctica, ambos médicos mencionados fueron seleccionados y nombrados por la demandada para los cargos de Médico-Director y radiólogo respectivamente, (después de haber investigado cuidadosamente su experiencia y capacidad, y en vista de informes fidedignos confirmando éstas)."

Esta última proposición fué establecida por la prueba practicada durante el juicio, y permanece prácticamente incontrovertida y sin impugnar.

La ley bajo la cual se organizó la institución demandada ordena que las siguientes estarán sujetas a sus disposiciones:

". . . . las asociaciones para fines religiosos, políticos, científicos, artísticos, benéficos y de recreo, o cualesquiera otros lícitos que no tengan por único y exclusivo objeto el lucro o la ganancia."

Dispone además que:

"Se regirán también por esta ley los gremios, las sociedades de socorros mutuos, de previsión . . ."

El artículo 2 de la misma ley excluye de sus preceptos las sociedades que no siendo de las antes enumeradas, se constituyan con fines meramente civiles o comerciales, caso en el cual se regirán por el derecho civil o mercantil, según sea el caso.    Alcubilla, 1887, página 320.

El Código Civil anterior, el Código Civil Revisado de 1902 y la "Ley para la formación de asociaciones que no tengan por objeto un beneficio pecuniario," aprobada el 9 de marzo de 1911, (Compilación de los Estatutos Revisados pág. 114), reconocen no solamente la existencia legal de las organizaciones sancionadas por la ley de 1887, si que también la diferencia esencial y la distinción necesaria que hay que hacer entre los fines y miras de tales organizaciones y los fines y empeños de otras entidades corporativas creadas y que funcionan entera y principalmente como empresas comerciales.

El artículo 291 de nuestro Código Político, (Tít. IX, Rentas, Capítulo I, Tasación de Propiedad), lee en parte como sigue:

"Estarán exentas de tributación para la imposición de contribuciones las propiedades siguientes:

   *       *       *       *       *       *       *

" (e) Todo edificio utilizado y destinado exclusivamente para el culto religioso, incluyendo escaños, asientos y muebles dentro del mismo; todo edificio utilizado para centro de educación, literario, científico o caritativo, con los muebles, enseres y aparatos pertenecientes al mismo; y toda superficie de terreno, cuya extensión no exceda de cinco cuerdas, en el cual dicho edificio o edificios esté o estén construidos; siempre que tales terrenos y edificios no sean arrendados o utilizados de otra manera con el fin de que produzcan un beneficio pecuniario, ya al arrendador, ya al arrendatario."

En el caso de *Vélez v. Llavina*, 18 D.P.R. 656, se indicó que las doctrinas y jurisprudencia americanas respecto a negligencia y actos torticeros serían adoptadas y seguidas en esta jurisdicción únicamente en tanto en cuanto tales doctrinas y jurisprudencia "se basen en los mismos precep-

tos de nuestro Código Civil o se deriven de principios generales de derecho que no lo contradigan.'' Véase también el caso de *Congco* v. *Manila Railroad Co.*, 38 Jurisprudencia Filipina, 816. En el caso de *Vélez* v. *Llavina, supra,* se resolvió por el voto de la mayoría del tribunal, según estaba entonces constituido (citando del sumario), que:

"La responsabilidad por actos u omisiones de otra persona sólo es exigible cuando la excepción a la regla general de que solamente responda una persona por los actos u omisiones propios, ha sido claramente consignada en la ley, porque revistiendo esa responsabilidad en cierto modo el carácter de pena, aunque civil, debe aplicarse el principio de que solamente puede una persona ser castigada, aunque sea civilmente, cuando la ley claramente lo ha dispuesto.

"No hay precepto alguno en el artículo 1804 del Código Civil ni en los demás que tratan sobre esta materia, que haga responsable al dueño de un automóvil o vehículo que no esté destinado a una empresa, de los actos negligentes del *chauffeur* del automóvil o conductor del vehículo.

"La redacción del artículo 1804 del Código Civil Revisado quita libertad a los tribunales de justicia para aplicar la responsabilidad a casos no comprendidos en dicho artículo, pues cuando una ley especifica y concreta en cuáles casos debe aplicarse la responsabilidad, no puede extenderse dicha responsabilidad a otros casos distintos, no comprendidos en el citado artículo, de acuerdo con el principio jurídico: *expressio unius est exclusio alterius.*

"No siendo responsable el dueño de un automóvil o vehículo particular de los actos de culpa o negligencia de su empleado como *chauffeur,* si dicho automóvil no forma parte de una empresa, y no habiéndose probado en el caso de autos que el automóvil del demandado formara parte de una empresa, no tiene el demandante causa de acción contra el demandado por los perjuicios que sufriera por los actos negligentes del *chauffeur* del demandado.''

El apelante en este caso no pone en duda la corrección del precedente así establecido, y no es necesario discutirlo por ahora. La doctrina del caso de *Vélez*, independientemente de lo que el juez que suscribe o cualesquiera otros pudieran pensar de ella, es la ley en esta jurisdicción.

En el caso de *Alicea* v. *Aboy*, 23 D.P.R. 108, se hizo re-

ferencia a la doctrina de la opinión del caso de *Vélez* v. *Llavina,* y se volvió a exponer en la siguiente forma:

"Después de detenida consideración resolvimos en el caso de *Vélez* v. *Llavina,* 18 D.P.R. 657, que el dueño de un automóvil no es responsable de los actos de culpa o negligencia de su empleado como *chauffeur,* si dicho automóvil no forma parte de una empresa."

Véase además el caso de *Truyol & Co.* v. *West India Oil Co.,* 26 D.P.R. 361, en el cual el primer párrafo del sumario dice así:

"La jurisprudencia establecida por esta Corte Suprema en el caso *Vélez* v. *Llavina,* 18 D.P.R. 667, no es la de que sólo existe responsabilidad para el dueño de un automóvil por los actos de su *chauffeur* cuando el automóvil forma parte de o constituye por sí sólo una empresa de transporte público. Si el automóvil se usa dentro de los negocios de cualquier empresa y el *chauffeur* es un empleado de dicha empresa y causa el daño con ocasión del ejercicio de sus funciones, la empresa es responsable por los actos de su empleado, de acuerdo con dicha jurisprudencia y con los artículos 1803 y 1804 del Código Civil."

En el caso de *Alicea* v. *Aboy, supra* esta corte también resolvió, disintiendo el juez que suscribe, que:

"El dueño de un automóvil o de otro vehículo no es responsable de los actos de culpa o negligencia de su empleado como *chauffeur,* si dicho automóvil no forma parte de una empresa, *Vélez* v. *Llavina,* 18 D.P.R. 656, aun cuando el dueño viaje en el automóvil o vehículo en el momento de ocurrir el acto negligente o culpable de su empleado, porque la ley no le ha impuesto esa obligación en las excepciones específicas establecidas a la regla general de que se es responsable de los actos u omisiones propios."

La palabra "empresa" (*enterprise*), según se usa corrientemente en el derecho español y según está definida por los diccionarios y enciclopedias españoles, generalmente significa una empresa o establecimiento comercial. Así, por ejemplo, en la Enciclopedia Jurídica Española por Francisco Seix, tomo XIII, página 533, hallamos la siguiente definición:

"Empresa. En el sentido en que más frecuentemente emplean esta palabra las leyes y disposiciones civiles y administrativas, dice tanto como Sociedad mercantil o industrial constituida para emprender o llevar a cabo obras materiales, negocios o proyectos de importancia; lo cual no significa que no pueda una *empresa* correr de cuenta de un solo individuo, quien aporta a ella su capital, sufriendo las pérdidas o recogiendo los beneficios de los negocios u operaciones, a que lo destina. En este último supuesto, suele, no obstante, substituirse la palabra *empresa* por la de *empresario.*

"El art. 1903 del Código Civil establece la responsabilidad subsidiaria de los directores de empresas por los perjuicios causados por sus dependientes en el servicio de los ramos en que los tuvieran empleados, o con ocasión de sus funciones, si no prueban que pusieron toda la diligencia de un buen padre de familia en prevenir el daño . . ."

Sin embargo, los apelantes citan del tomo 12 de Manresa, página 648, la siguiente manifestación:

"El Tribunal Supremo ha declarado (sentencia de 6 de Dic. de 1921) que es dependiente a los efectos del Art. 1903, el director de un periódico explotado por una sociedad, porque cualquiera que sea su jerarquía y aunque lleve la dirección de determinadas convicciones políticas, no por eso deja de estar subordinado a la superior autoridad de la empresa."

Desde el punto de vista de los apelantes, eso es probablemente lo más que se aproxima al presente caso en los anales de la jurisprudencia española. También el extracto de Manresa señala el poder de un dominio directo e inmediato que puede ser ejercido por los dueños de un periódico sobre el director del mismo en su capacidad de empleado subalterno, como el *ratio decidendi* de la decisión. La existencia hipotética de tal superintendencia y dominio sobre un médico-cirujano en el diagnóstico y tratamiento de enfermedades, al ser puesto a cargo de un hospital por el dueño del mismo, no siendo tal dueño un médico-cirujano, o por una junta de síndicos o directores compuesta de profanos, difícilmente podría servir de base satisfactoria para responsabilidad civil, aun en ausencia de prueba en cuanto

al carácter independiente del médico-cirujano así puesto en la dirección de tal institución.

Un periódico puede ser, y con frecuencia lo es, una empresa infructuosa, si la miramos a traves del lente financiero. Puede sostenerse, aun a costa de una pérdida pecuniaria, como un medio de anuncio, para fines políticos o de otra propaganda, o con fines puramente desinteresados y altruistas. Pero difícilmente puede considerársele como una institución benéfica. Es lógico asumir que la Corte Suprema de España nunca ha resuelto que una asociación benéfica, organizada de acuerdo con la ley de 1887, sea responsable de daños y perjuicios por lesiones personales o daños causados por la culpa o negligencia de empleados subalternos o de cualesquiera otros, bajo la teoría de que tal organización es una "empresa" dentro del significado del artículo 1903 del Código Civil español.

Es cierto, según se indicó en el caso de *Morales* v. *Caraballo,* 27 D.P.R. 591, que el artículo 17 de la ley para reglamentar el uso de vehículos de motor, aprobada poco después de la decisión de este tribunal en el caso de *Alicea* v. *Aboy, supra,* hace responsable al dueño de cualquier vehículo de motor por los daños causados debido a la negligencia del conductor o *chauffeur* mientras tal dueño se encuentra en el vehículo. Pero esa disposición es en efecto una enmienda del artículo 1804 del Código Civil tal como fué interpretado por esta corte, y no altera o modifica en forma alguna la interpretación dada al artículo últimamente mencionado en lo referente a la responsabilidad del dueño de un automóvil privado, cuando dicho dueño no se halla en el vehículo en el momento en que ocurre el accidente. No solamente por el contexto del artículo 1804 según ha sido interpretado por este tribunal, si que también por una ratificación legislativa tácita y por la aprobación de tal interpretación judicial, el dueño de un automóvil que no es usado como parte de una "empresa," o en relación con la misma, está exento de toda responsabilidad civil por la "culpa" o

negligencia de su *chauffeur,* a menos que tal dueño esté dentro del carro en el momento en que ocurre el accidente. Si no fuera por la reciente limitación legislativa sobre tal exención, el dueño de un automóvil privado que no es usado en relación con una ''empresa'' todavía estaría exento de toda responsabilidad legal, aun cuando estuviera sentado al lado de su *chauffeur* al tiempo de ocurrir un accidente debido a la culpa o negligencia de ese empleado, mientras éste actúe dentro de las atribuciones de su empleo.

De acuerdo con la ley según está ahora en vigor, un hombre de negocios que pide por teléfono que le traigan su carro no sería responsable de daños y perjuicios ocasionados por la negligencia de su empleado, el conductor, mientras éste se dirige a la ciudad en cumplimiento de lo solicitado en la llamada. Pero si el mismo carro, mientras no está siendo utilizado por el mismo dueño, se utiliza para efectuar entregas en conexión con el negocio del dueño, y ocurre un accidente debido a la negligencia del conductor mientras el vehículo está siendo así usado, entonces el dueño es responsable. Si el dueño de una central azucarera envía su carro privado con su *chauffeur* acompañado de un inspector de caña en un viaje de inspección por las fincas de los colonos que sean partes en contratos de molienda o de refacción agrícola efectuados con dicho dueño, éste sería responsable de cualquier accidente que pudiera ocurrir como resultado de la negligencia de su *chauffeur*. Si ocurriere un accidente similar mientras el *chauffeur* del mismo carro se dirigiera a un teatro con el fin de poner el vehículo a disposición del dueño y su familia después de la función, de acuerdo con instrucciones recibidas del dueño, éste no sería responsable. La única base lógica para hacer tal distinción debe hallarse en el hecho de que en todos los casos en que puede hacerse responsable al dueño, el automóvil en cuestión, en el momento del accidente, está obteniendo para el dueño un beneficio pecuniario sobre el dinero invertido en el vehículo y su costo de mantenimiento, incluyendo el

sueldo del *chauffeur,* mientras que en todos aquellos casos en que puede considerarse que el dueño está exento de responsabilidad, el carro es comprado y sostenido a un gasto considerable no con el fin de obtener un beneficio pecuniario sobre el dinero invertido en él, sino más bien para el solaz, comodidad, conveniencia, placer y regocijo de tal dueño.

No podría decirse, pues, que el dueño de un hospital benéfico es responsable por la negligencia del conductor de una ambulancia mientras transporta pacientes insolventes a tal hospital o desde él, no obstante haberse ejercido el debido cuidado y precaución al seleccionar y emplear tal conductor, porque una institución benéfica es "un establecimiento o empresa" dentro del significado del artículo 1804 del Código Civil. *A fortiori* los dueños y directores de un hospital privado, que ha sido organizado y que funciona sin fin pecuniario alguno, no pueden razonablemente hacerse responsables de los daños causados por la negligencia en el diagnóstico y tratamiento de un enfermo, por parte de un médico-cirujano que ha sido seleccionado después de haberse hecho una investigación detenida de su habilidad profesional, experiencia y reputación, y puesto en la dirección de tal institución.

La misma regla parecería ser aplicable tratándose de un especialista en rayos X seleccionado en forma similar y puesto en un cargo de responsabilidad y de confianza como un director más o menos independiente de determinado departamento científico.

En el caso de *Vélez* v. *Llavina, supra,* se resolvió, volviendo a copiar del sumario, que—

"Para que un automóvil pueda considerarse como dedicado a una empresa de automóviles es necesario que el dueño del automóvil lo dedique habitualmente al negocio de conducir pasajeros transportando a cualquiera que le pague el precio correspondiente, y el hecho de que el dueño alquile el automóvil de su uso particular a determi-

nados amigos y no a cualquier persona, no lleva como consecuencia que tuviera su automóvil dedicado a la empresa de conducción de pasajeros.''

Del mismo modo, el mero hecho de que en un solo caso a un paciente se le cobrara un precio módico por una habitación. en un hospital benéfico y un precio razonable por ciertas radiografías, no es suficiente para convertir a una institución benéfica en un establecimiento o empresa comercial.

[3] La sentencia de la corte inferior le concedió las costas a la demandada. El señalamiento de errores no impugna directamente este pronunciamiento, y, por lo regular, en ausencia de tal especificación, la cuestión no sería atendida en apelación. Sin embargo, en el presente caso las circunstancias son peculiares y excepcionales. Si no fuera porque la demandada no es una empresa responsable de acuerdo con la ley y la jurisprudencia tales como acaban de exponerse en esta opinión, con lo que resulta de los autos, hubiérase revocado la sentencia de la corte de distrito, y en su lugar, se hubiera dictado sentencia a favor de los demandantes, con o sin costas. Hasta ahora este tribunal ha resuelto que un error que no se señala ni se decide en la apelación de la sentencia original, no será considerado en la apelación de una orden aprobando un memorándum de costas. Aunque generalmente en ausencia de señalamiento de error no debe alterarse un pronunciamiento de costas, sin embargo, estamos convencidos de que sería una injusticia permitir que subsista tal pronunciamiento cuando la cuestión principal envuelta era enteramente discutible, de acuerdo con las condiciones expresadas en esta opinión. No puede surgir cuestión alguna en cuanto a nuestra autoridad para modificar la sentencia a este respecto.

*Debe modificarse la sentencia apelada de conformidad, y, así modificada, se confirma.*

El Juez Asociado Señor Texidor no intervino.