[No. 16008.   Department Two.   November 22, 1920.]

*In the Matter of the Estate of* WILLIAM DUNCAN.
THOS. N. STRONG, *Respondent,* v. J. M. THATCHER,
*as State Tax Commissioner, Appellant.*[1]

TAXATION (225-229) — INHERITANCE TAXES — EXEMPTIONS — BE-
QUESTS FOR CHARITABLE PURPOSES—STATUTES—CONSTRUCTION.  A be-
quest by a missionary in trust for the purpose of carrying on his
life work, which was the uplifting of a tribe of natives from a
state of heathenism to the light of Christianity and the comforts
of a Christian civilization, is not exempt from the inheritance tax
under Laws of 1917, p. 597, § 6, which only exempts charitable
bequests and devises for the relief of aged, impotent (indigent) and
poor people, the maintenance of the sick or maimed, or the support
or education of orphans or indigent children.

. SAME.  A particular bequest to be used in the discretion of the
trustees for the relief of the unfortunate and helpless, is not ex-
empt from the inheritance tax, under Laws of 1917, p. 597, § 6, where
the trustees had the power and discretion to merge the fund with
a general fund bequeathed for purposes other than the relief of
the aged, indigent or orphans, exempted by such act.

Appeal from a judgment of the superior court for
King county, Jurey, J., entered February 9, 1920, in
favor of the plaintiff in probate proceedings, adjudg-
ing an estate to be exempt from the payment of an
inheritance tax, after a hearing before the court.  Re-
versed.

*J. M. Thatcher* and *Geo. G. Hannan,* for appellant.
*C. Henri Labbe* and *James G. Wilson,* for respond-
ent.

TOLMAN, J.—William Duncan, a native of England,
was sent out as a missionary, under the auspices of the
Church of England, to the natives of the North Pacific
Coast in the year 1857.  He first began his work at the
British post of Fort Simpson, but in a short time estab-

[1]Reported in 193 Pac. 694.

lished a mission some seventeen miles distant from that fort, where he built a village for his converts, surrounded them with many of the comforts of civilization, and finding that the education and enlightenment which he imparted increased their wants and required an increase in their earning power, in order that the good work should continue, he established a number of industries in which the natives were employed and some became shareholders. Such employment also served the purpose of teaching the natives regular habits, the uses and customs of civilization, increased self respect, and made them more amenable to the religious and moral instructions which it was his principal purpose to impart. He also established a school and taught his people to read and write, and as an important and necessary part of the work, he cared for the sick and afflicted, furnishing medicines, and part of the time at least, a physician at his own expense. Mr. Duncan proved to be a man of extraordinary capacity for the work, combining qualities of a great leader and teacher with unusual business and executive ability, so that his enterprise prospered almost beyond belief. His converts were many, their village was well built and well equipped, the industries were successful, and some at least paid dividends, and the people in his charge were in the main well cared for, both physically and morally, well-to-do, contented and happy.

After some twenty-five or thirty years, the Church of England insisting upon certain religious ceremonies which he thought unsuited for his people and unwise, he secured from the United States Government the right to remove his people to Annete Island, in American territory, and this island was afterwards made a reservation by act of Congress. In the new location

the surroundings were even better than they had been before. Mr. Duncan, by his ability and energy, caused the new homes to be better built, waterworks to be established, and a handsome church, school, town hall, and other public buildings to be erected. The industries were enlarged and increased so that they furnished greater opportunities for employment and income, and under his guidance as religious leader, teacher, governor, judge, and business manager, the community prospered remarkably in every way, and Mr. Duncan himself, through his own investments in the industries he had established, acquired in his own right $138,679.09, which was on deposit in a bank in Seattle at the time of his death.

As Mr. Duncan grew older his capacity for work naturally waned, and a few years before his death, which occurred on August 30, 1918, at the age of eighty-six years, the government took over the schools, and the industries were either closed out or their control passed to others, and thereafter Mr. Duncan confined his activities to preaching, conducting Sunday schools, giving advice, settling disputes among his people, and carrying on, much as theretofore, the free medical service and charitable work among those who were unfortunate or in need.

Mr. Duncan died testate. Because of the money in the bank, above mentioned, his will was admitted to probate in King county, in this state, the executor filed an inventory showing that the estate within this state consisted only of such money in bank. Appraisement was dispensed with, and thereafter the executor filed a petition in the cause praying that the estate be exempted from the payment of any inheritance tax upon the ground that it was devised for charitable purposes within the meaning of the statute. From a

judgment granting the prayer of the petition, the state tax commissioner has appealed.

The question presented to us cannot be answered without considering the will, and the purpose and intent of the testator is so carried into each of its provisions that we set forth the body of the will in full:

"In the name of God, amen. I, William Duncan, of Metlakahtla, Alaska, of the age of eighty-four (84) years, being of sound mind and body, but remembering the uncertain nature of this transitory life, do make this my last will and testament in manner and form as follows, towit:

"First: It is my will and I do order that all my just debts and funeral expenses be duly paid and settled as soon as can conveniently be done after my decease.

"Second: Whereas it has always been my intention and desire to, as far as practicable, perpetuate the mission work which our most gracious Lord has permitted me as his humble instrument to conduct for the betterment and uplifting of the people of certain native tribes of the North Pacific Coast, and in particular the Tshimsheans, whom upon my arrival in 1857 I found in a degraded state of heathenism; and

"Whereas our Heavenly Father has with tender mercy blessed our efforts and many have been rescued from their dark and evil ways to the light of the simple Gospel of our Redeemer, Jesus Christ; and

"Whereas a large number of these people have attained to a creditable degree of christian civilization and their material condition has been considerably improved; and

"Whereas my experience and observation have convinced me that it is necessary in the case of our native races for them to have very careful guidance for some generations at least to secure the necessary self-restraint, self-respect and self-reliance and to create in them a spirit of manliness and pride so that they may make their own way and become entirely self-supporting and worthy of the rights of full citizenship; and

"Whereas I have certain just claims against the Government of the United States on account of the

destruction of industries and business and the seizure
of buildings and other property; and

"Whereas in the course of my said missionary work
I have by my own labor and efforts acquired a certain
amount of money and property which is my own prop-
erty but which I propose and intend shall be expended
for the maintenance and support of said mission or
similar work along the lines upon which I have so long
conducted it;

"Now, therefore, to carry such intent and purpose
into execution, I hereby give and bequeath unto
Thos. N. Strong of the City of Portland, Oregon, and
Dr. Benjamin L. Myers and H. C. Strong of Ketchikan,
Alaska, all of my property, real, personal, and mixed,
and wheresoever situated;

"*In trust, however,* for the carrying on and support
of the religious, medical, and educational work in be-
half of and for the use and benefit of the Mission of
the Christian Church of Metlakahtla, Alaska, now be-
ing conducted at said Metlakahtla, and such other in-
stitutions or for such other native people as they may
hereafter deem wise or proper; under condition, how-
ever, that said medical, religious, and educational work
shall always be carried on in the same spirit and as
free from all sectarian influences as it has been my aim
and endeavor during the past years to carry it on.

"The said trustees shall be vested with the title and
ownership and shall take to themselves all my prop-
erty, real, personal and mixed, with full power of sale
or other disposition thereof, and shall invest and rein-
vest the same as such trustees shall deem best or as
circumstances may make necessary, and apply it and
the rents, issues and profits thereof and of such invest-
ments to the maintenance, support and upbuilding of
said mission work or such similar work as they may
hereafter undertake. In the maintenance of such work
I urge upon my said trustees that they shall encourage
cleanliness in all things and orderliness and discipline;
they shall encourage domestic virtues and habits of
forbearance and obedience to, and respect of, parents,
and shall train the young girls in domestic duties;
that they shall encourage healthy sports and amuse-

ments; and the spirit of helpfulness to others who may be in distress or who may meet with misfortune. No alcoholic drinks shall be allowed or dance halls or similar places of bad character, and the living of any of the people in adultery shall be sternly discouraged.

"And to the end that the said trustees may have power to carry out as far as may be my intentions in this will, I do hereby declare that for such purpose I give to my said trustees full, free, and absolute power to formulate and carry into effect such or any scheme or schemes as they may deem advisable so as to give effect as nearly as possible to my wishes, and for such purpose to execute and do such acts and deeds as they may deem expedient in order to carry out what they, my trustees, shall decide to be my original desires and wishes, so as to make the same conformable to law; and in case any question shall arise between my trustees and any beneficiary in respect thereto or otherwise in regard to my estate, the decision of my trustees shall be final and binding; and I hereby declare that if it shall appear to my trustees or be decided by the court that any plan to carry out the provisions of this will adopted by said trustees is impracticable or inexpedient, my trustees shall be at liberty to reject the, same and adopt new measures and plans; and

"I declare that all moneys liable to be invested under this my last will may be invested in the name of the trustees or under their legal control, as to them shall seem expedient, in any good or substantial bonds or first mortgages which my trustees shall deem best. In case of loans on mortgages my trustees shall lend not more than one-half the value of such securities as certified by the valuer or valuers employed by my trustees. And I also declare that the trustees shall serve without compensation but shall be repaid all travelling or other expenses, and shall be at liberty to conduct the said business through other persons or parties or corporations to be formed by themselves or otherwise, to whom they shall pay or give a reasonable support or compensation; and

"I also declare that twenty thousand dollars ($20,-000) of such funds shall be invested separately, and

the income thereof shall constitute a fund to be known as the 'Benevolent Fund.' My trustees, at their absolute discretion, may make from this Benevolent Fund grants or contributions to members of the Mission of the Christian Church at Metlakahtla, Alaska, or elsewhere, in cases of distress and misfortune which may render them helpless or incapable of proper self-support.

"If at any time my trustees shall consider that the need or desirability of such grants from the Benevolent Fund has ceased, then the twenty thousand dollars ($20,000) and the income thereof may be merged into the general fund.

"I also declare that in case of the death or inability to act of any of said trustees, or if any of said trustees should desire to resign or decline to undertake said trust, that the remaining trustees shall appoint a trustee to take the place of such trustee not acting; and

"I do hereby declare that in case any person whomsoever or any institution which shall take any benefit under this will shall take or attempt to take or support any adverse proceedings to set aside any of the provisions of this my will, or shall set up any claim in respect of any of my property whatsoever or wheresoever situated other than what is specifically given to such person or institution by this my will, such person or institution shall thereby be deprived of such benefit as though no provision had been made for him, her, or them, or for such institution in this will; and

"I do hereby declare that the said trustees shall have full power and authority over all said property and all the rents, issues and profits through the said trust; and if at any time the said mission work at Metlakahtla is carried on by the people connected with it in such manner as may not meet with the approval of my trustees, or it is without effect or beneficial results, then in such case the said trustees may apply the said property and all funds derived by them from the rents, issues and profits thereof to other church and mission work of the same general character at said Metlakahtla or at such other point or

points in Alaska or elsewhere as they may deem best; and

"Lastly, I nominate, constitute and appoint the said Thos. N. Strong, of Portland, Oregon, Benjamin L. Myers and H. C. Strong of Ketchikan, Alaska, to be the executors of this my last will and testament, and desire that all bonds to be given by them as such executors or trustees shall be paid for out of the funds of my said estate."

The only property here in question is the money on deposit in the bank at Seattle, and being within the state, and the will having been probated within the state to the end that this money be distributed by the courts of this state, there is, and can be, no contention but that, under the general provisions of the inheritance tax law, the fund is subject to the tax, unless exempted by Laws of 1905, p. 199, ch. 93, as amended by Laws of 1917, p. 597, § 6, which reads as follows:

"All bequests and devises of property within the state when the same is for one of the following charitable purposes, namely: The relief of aged, impotent (indigent) and poor people; maintenance of the sick or maimed or the support or education of orphans or indigent children . . . shall be exempt from the payment of any tax or sum under any inheritance tax law; and any property in this state which has been devised or bequeathed for such charitable purposes, and upon which a state inheritance tax is claimed or is owing, is hereby declared to be exempt from the payment of such tax, and the same is hereby remitted."

It will be observed that this act is somewhat narrow in its terms. It does not purport to exempt bequests for any or all charitable purposes, but confines the exemption to those specifically named, which are: (1) relief of aged, indigent and poor people (and we will assume that, if the objects of charity be poor, they need not necessarily be aged); (2) the maintenance of

the sick and maimed, and (3) the support and education of orphans or indigent children.

Let us see if any of the purposes for which this money is to be expended under the terms of the will can be brought within the provisions of the statute. In the preamble to the second paragraph of the will, the testator in a modest way expresses the purpose of his work and the success attained, which may be fairly summarized as the uplifting of the natives from the degraded state of heathenism in which he found them, to the light of Christianity, and the blessings and comforts of Christian civilization, and guiding them along the way until they are able to proceed alone—a high and noble enterprise, indeed, in which the testator was remarkably successful, and one which the legislature might well have recognized as charitable, but clearly not any one of the charitable purposes which the statute favors.

But proceeding further, the bequest was made "for the carrying on and support of the religious, medical and educational work in behalf of and for the use and benefit of the Mission of the Christian Church of Metlakahtla, Alaska, now being conducted at said Metlakahtla, and such other institutions or for such other native people as they may hereafter deem wise or proper; under condition, however, that said medical, religious, and educational work shall always be carried on in the same spirit and as free from all sectarian influence as it has been my aim and endeavor during the past years to carry it on." And also: "In the maintenance of such work I urge upon my said trustees that they shall encourage cleanliness in all things and orderliness and discipline; they shall encourage domestic virtues and habits of forbearance and obedience to, and respect of, parents, and shall

train the young girls in domestic duties; that they shall encourage healthy sports and amusements; and the spirit of helpfulness to others who may be in distress or who may meet with misfortune. No alcoholic drinks shall be allowed or dance halls or similar places of bad character, and the living of any of the people in adultery shall be sternly discouraged." It appears from the record that Mr. Duncan had permitted the industries and the schools to pass out of his control some years before his death and before the making of his will, and while perhaps incompetent as evidence, one of the trustees under the will testified that the trustees had no intention or purpose to resume the school or industrial work. The term "educational work" as used in the will must be construed in the light of conditions existing when the will was made, and so construed it would seem to refer only to the religious and moral education of the people generally, and not in any sense to the education of "orphans or indigent children." There remains then only the medical work which might be held to come under the statute, but it is simply an incident to the main work for which the bequest must be chiefly used, and no one can now say what portion of the fund the trustees might see fit to use for the maintenance of the medical work and none can compel them to use any fixed amount for such purpose. The commingling of a purpose recognized by the statute with other purposes not so recognized will defeat the exemption. *Alfred University v. Hancock,* 69 N. J. Eq. 470, 46 Atl. 178.

It is argued that the work as a whole as carried on by Mr. Duncan was for the relief of aged, indigent and poor people, with the intent that they should be brought from a state of ignorance, poverty and savagery up to a condition in which they, without further

help or guidance, would be self-supporting and fit to exercise the rights and duties of citizenship. This argument has some force when applied to the time during which Mr. Duncan conducted the industries referred to, and furnished employment and income to his people, and was in fact the means through which they derived their support and livelihood; but, as we have seen, the industries were given up by Mr. Duncan some years before making his will, and at that time the people gained their livelihood without material assistance from him, except the medical service and minor charities to some few who were specially unfortunate or helpless. We shall speak again of these minor charities in connection with the benevolent fund hereinafter discussed.

All right thinking people must approve of the work done by Mr. Duncan and sympathize with his desire that it should be carried on after his death, and it is a matter of regret that the state, through its tax laws, should divert any portion of the money from the objects of the testator's bounty, and yet the laws must be upheld. No reasonable construction placed upon the language of the statute will enable us to say that the legislature intended that which it did not say, and in the absence of reasonably clear legislative action, we cannot hold that the inheritance tax does not apply.

There is a provision in the will which sets aside $20,000 to be invested separately, the income from which shall constitute a benevolent fund to be used by the trustees in their discretion for the relief of the distressed, unfortunate, and helpless, and though the principal sum is not to be consumed in charity, still we might hold it exempt from the tax but for the further provision that the trustees in their discretion may at any time determine that the need or desira-

bility of such a fund has ceased, in which event the principal sum and the income therefrom shall be merged with the remainder of the estate. It is quite apparent from the record that the testator believed that the income from this fund would suffice to carry on the charitable work which he had been performing in the years immediately preceding the making of his will, such as distributing food to those who were without, and making advances to those who had met with misfortune, and this is added evidence that the main bequest is not charitable in the statutory sense. We have sought for some way to avoid a diminution of this fund, but since it is wholly within the discretion of the trustees to divert the fund as and when they see fit, and when so diverted it must be treated as the remainder of the estate, we see no escape from the conclusion that if to do good in this case we should lay down the rule that the fund is not taxable, we would thereby open a way by which the unprincipled might in all cases avoid the tax entirely.

The judgment appealed from is reversed, and the cause remanded for further proceedings not inconsistent with these views.

Holcomb, C. J., Mount, Mitchell, and Main, JJ., concur.