[No. 23816. Department One. June 6, 1932.]

*In the Matter of the Estate of* WILLIAM R. RUST, *Deceased.*[1]

*G. W. H. Davis,* for appellant.

*Ellis & Evans,* for respondent.

PARKER, J.—This is an appeal by the supervisor of our state inheritance tax and escheat division from a decree of the superior court for Pierce county, adjudicating that two certain testamentary gifts, made

[1]Reported in 12 P. (2d) 396.

by William R. Rust, deceased, to the Tacoma General Hospital, are exempt from the payment of inheritance tax, because of the charitable purposes for which the hospital exists and is actually maintained, and the charitable purposes for which the testamentary gifts were made. The issues were presented by appropriate pleadings in the probate administration proceedings in the estate of William R. Rust, deceased, pending in the superior court for Pierce county; the supervisor claiming for the state an inheritance tax against the gifts and the executor, and the hospital resisting such claim of the supervisor.

On July 19, 1887, the Right Reverend John A. Paddock, with a number of other residents of Tacoma, duly executed articles of incorporation, reading in part as follows:

"Know all men by these presents that we, the undersigned, have this day voluntarily associated ourselves together for the purpose of forming a corporation, under the laws of the territory of Washington, relating to the creation and organization of corporations and societies for benevolent and charitable purposes, and we do hereby certify:

. . . . . . . . . . .

"Second: That the corporate name of said corporation is 'The Fannie C. Paddock Memorial Hospital,' and its location and chief place of business is to be at the city of Tacoma, in the county of Pierce and territory of Washington.

. . . . . . . . . . . .

"Fourth: That the objects and purposes of this corporation are to construct, erect and maintain a hospital for the sick, aged and infirm, at the city of Tacoma, in the county and territory aforesaid, the said hospital to be open to all without reference to creed or nation; . . .

. . . . . . . . . . .

"Sixth: That the number of trustees who are to manage the affairs of said society is hereby fixed at

346

fifteen; and the names of the Trustees of said society for the first year of its existence are: The Rt. Rev. J. A. Paddock, . . . [Here follow fourteen other named residents of Tacoma.]''

On March 29, 1895, the articles of incorporation were amended to read in part as follows:

''Sixth: That the number of trustees who are to manage the affairs of said society is hereby fixed at seventeen . . . the mayor of the city of Tacoma and the chairman of the board of county commissioners of Pierce county shall be ex officio trustees of this corporation.''

On July 9, 1912, the articles were further amended to read in part as follows:

''First: The name of the corporation shall be 'Tacoma General Hospital, The Fannie C. Paddock Memorial.'

''Second: That the objects for which said corporation is formed are to erect a hospital or hospitals, and to furnish medical and surgical attendance therein for sick and injured persons. . . .

''Fourth: That the membership of said corporation shall consist of and the affairs of said corporation shall be managed by nineteen trustees, of which number the bishop of the diocese of Olympia of the Protestant Episcopal Church, shall be a member and trustee ex officio, the mayor of the city of Tacoma, Pierce county, Washington, shall be a member and trustee ex officio, the chairman of the board of commissioners of Pierce county, Washington, shall be a member and trustee ex officio. . . .''

On October 10, 1925, the articles of incorporation were further duly amended to read in part as follows:

''Second: The objects for which this corporation is formed are as follows: To build, erect, maintain, equip, manage and operate a hospital or hospitals, and to furnish medical and surgical attendance therein in any form for the care of the sick, afflicted, infirm or injured persons; and to generally do anything and

everything necessary, expedient or incidental to the operation of a hospital in all its phases; . . . "

The original articles of incorporation and all of these amendments thereto were duly made of public record, as required by law.

The corporation was manifestly originally incorporated under §§ 2450-2451 of the territorial code of 1881, relating to the formation of corporations for charitable purposes, and has continued its existence under chapter CLVIII, Laws of 1895, p. 400, now embodied in §§ 3872 *et seq.,* of Remington's Compiled Statutes, relating to the formation of corporations for charitable purposes. There is no language in the original articles of incorporation or in any of the amendments thereto indicating any intent that the corporation shall have any capital stock or any stockholders, or anyone standing in a proprietary relation thereto, with a view of its operating for private profit.

The management of the corporation has never in the slightest measure managed any of its properties or affairs looking to private profit to anyone; but, on the contrary, has always managed its properties and affairs to the end that there shall be no such profit. The corporation was, at the time of its organization in 1887, moderately endowed by gifts sufficient to start it on its career and commence the rendering of hospital service. Since then, it has from time to time received additional gifts aggregating a large amount, by which it has been able to acquire a large, very valuable and well-equipped hospital plant in Tacoma.

Regular charges are made upon the books of the hospital against all patients therein. Compensation is exacted accordingly from those who are able to pay, but not exacted from those who are unable to pay. Many who are well able to pay liberally for hospital services are cared for and charged accordingly. Many

of less means who are able to pay for hospital services are cared for and charged accordingly for such services. A considerable number of practically no means, who are unable to pay anything for hospital services, are cared for, from whom no charge is exacted. No one is turned away for the sole reason of his or her inability to pay. Several thousand dollars worth of hospital services to the latter has been rendered annually, wholly without compensation to the corporation.

This method of management has resulted in loss to the corporation during some years and has resulted in profit to the corporation during other years. Whatever profits have been so earned have been used, together with gifts to the corporation, for the upkeep and improvement of its hospital plant. There is nothing in the record before us to indicate any intent on the part of the corporate management to devote any of the properties or income of the corporation to any other than hospital services along the lines we have noticed.

One of the testamentary gifts made by William R. Rust to the corporation reads, in so far as need be here noticed, as follows:

"Item IV. I give and bequeath to Tacoma General Hospital, of Tacoma, Washington, bonds aggregating a principal face value of fifty thousand dollars ($50,-000), said bonds being specifically known and numbered as follows: [Here follows specific description of the bonds so given to the corporation.]"

This manifestly was an unconditional gift to the corporation for its general purposes, the nature of which was well known to Mr. Rust at the time he executed his will making his testamentary gift on November 3, 1927, and at all times thereafter until his death, when the gift became effective. This gift was there-

after actually expended by the corporation in the physical improvement of its hospital plant.

The inheritance exemption invoked by the executor and the corporation, and upon which the decree of the superior court is rested, in force at the time Mr. Rust executed his will and since then, is found in the following language of chapter 51, Laws of 1921, p. 160, Rem. Comp. Stat., § 11218, and, in so far as need be here quoted, reads:

"All bequests and devises of property within this state when the same are for one of the following charitable purposes, namely, (1) the relief of the aged, indigent and poor people, (2) *maintenance of sick or maimed*, (3) the support or education of orphans or indigent children, . . . shall be exempt from the payment of any inheritance tax . . ."

We have italicized the words with which we are here particularly concerned. We have also for convenience of reference numbered each of the three specified "charitable purposes." It is to be noticed that the second is simply "maintenance of sick or maimed." This does not, in terms, confine such purpose to the "maintenance of sick or maimed" who are dependent upon benevolence or charity in the popular sense, yet the "maintenance of sick or maimed" without qualification is expressly stated to be a "charitable purpose" for the purpose of exemption.

It seems to us, in the light of the declared purposes of the corporation in its original articles, in the amendments thereto, and in the light of the history of its management in harmony with those declarations, that its purposes so evidenced can well be expressed as being for the "maintenance of sick or maimed," within the meaning of this statutory exemption provision.

We may concede for present purposes that, if the corporation were actually managed looking to private

profit, its purposes would not be charitable in a legal sense so as to exempt this gift from the statutory exemption tax. But we have seen that it never had or assumed to have any such purpose.

We may also concede that, if this gift were made to the corporation with discretionary power in its management to use it for some purpose apart from the purposes for which the corporation was organized, as in the case of *In re Duncan's Estate,* 113 Wash. 165, 193 Pac. 694, the gift would not be exempt from inheritance tax. But manifestly the management of the corporation has no such discretionary power; nor has it assumed to exercise any such power. Indeed, it has, as we have seen, actually used the gift to physically improve its hospital plant.

It is argued in behalf of appellant, in substance, that, because payment for hospital services is exacted from patients receiving such services who are able to pay therefor, and who, for present purposes, we may concede constitute the much larger number of persons receiving such services, the corporation is thereby, in effect, conducting its affairs for profit, and thus is shown to be, in fact, not a corporation for "charitable purposes" in a legal sense.

It has been repeatedly held, we think, by the great weight of authority in this country, that mere profit to the corporation itself, it having no stockholders to share such profit and no one standing in any proprietary relation to it to share in such profit, does not make such corporation other than a charitable corporation. The applicable law, we think, was well stated by Justice Berry, speaking for the supreme court of Minnesota in 1881 in the well considered case of *County of Hennepin v. Brotherhood of Gethsemane,* 27 Minn. 460, 8 N. W. 595, 38 Am. Rep. 298, as follows:

"In legal parlance the word 'charity' has a much wider signification than in common speech. But, without undertaking to give a general definition, it will be sufficient for all the purposes of this case to say that an institution established, maintained and operated for the purpose of taking care of the sick, without any profit, or view to profit, but at a loss which has to be made up by benevolent contribution, is a charity. If, in addition to this, the institution is one the benefits of which the public generally are entitled to enjoy, it is then a purely public charity—public, because although not owned by the public, its uses and objects are public; purely public, because its uses and objects are wholly public, and for the benefit of the public generally, and in no sense private as being limited to particular individuals. The word 'public' has two proper meanings. A thing may be said to be public when owned by the public, and also when its uses are public. The Cottage Hospital falls within this description of an institution of purely public charity. That patients who are able to pay are charged for hospital services according to their ability, and that the county pays for such services rendered to those who are a legal county charge, are facts of no importance upon the question as to the character of the institution as one of purely public charity; for the fact still remains, that, notwithstanding all receipts from such sources, the hospital is established, maintained and conducted without profit or a view to profit, and that, on the whole, it is operated at a loss, which is necessarily made up by private contributions." 

In the comparatively late decision of the supreme court of Kansas in *Nuns of Third Order of St. Dominic v. Younkin*, 118 Kan. 554, 235 Pac. 869, Justice Harvey, speaking for the court, stated the law, citing many decisions in support of his remarks, as follows:

"When an institution is incorporated for benevolent purposes without capital stock and no dividends are declared or paid, and conducts a hospital, and all the earnings of the hospital from pay patients, all gifts, devises, bequests, or income from whatever source are

used in the maintenance, extension, and improvement of the hospital, and which admits patients without regard to race, creed, or wealth, it is uniformly held that such hospital is conducted exclusively for charitable purposes. . . .

"The fact that it charges and receives pay for patients able to pay does not detract from the charitable nature of the service rendered. . . .

"If these incomes from pay patients and donations are used for the purpose of caring for or relieving the sick or disabled and increasing the facility of the institution for that purpose, and are not used for the purpose of declaring dividends or the financial profit (other than the paying of necessary operating expenses) of those connected with or having charge of the institution, such use is simply an extended use for charitable purposes."

Among numerous decisions supporting this view of the law, we note the following: *Hot Springs School District v. Sisters of Mercy*, 84 Ark. 497, 106 S. W. 954; *City of Dayton v. Trustees of Speers Hospital*, 165 Ky. 56, 176 S. W. 361, Ann. Cas. 1917B 275; *St. Elizabeth Hospital v. Lancaster County*, 109 Neb. 104, 189 N. W. 981; *Philadelphia v. Pennsylvania Hospital*, 154 Pa. 9, 25 Atl. 1076; *Sisters of Third Order of St. Francis v. Board of Review*, 231 Ill. 317, 83 N. E. 272; *New England Sanitarium v. Inhabitants of Stoneham*, 205 Mass. 335, 91 N. E. 385; *Santa Rosa Infirmary v. City of San Antonio*, 259 S. W. (Tex. Com. App.) 926; *Lutheran Hospital Ass'n v. Baker*, 40 S. D. 226, 167 N. W. 148.

The decisions of our own court and others, touching the question of tort liability of corporations organized and maintained for charitable purposes, lend strong support to the view of the law above noticed: *Magnuson v. Swedish Hospital*, 99 Wash. 399, 169 Pac. 828; *Powers v. Massachusetts Homeopathic Hospital*, 109 Fed. 294, 65 L. R. A. 372; *Downs v. Harper Hos-*

*pital,* 101 Mich. 555, 60 N. W. 42, 45 Am. St. 427, 25 L. R. A. 602; *Duncan v. Nebraska Sanitarium & Benev. Ass'n,* 92 Neb. 162, 137 N. W. 1120, Ann. Cas. 1913E 1127, 41 L. R. A. (N. S.) 973; *Gable v. Sisters of St. Francis,* 227 Pa. 254, 75 Atl. 1087, 136 Am. St. 879.

We have not overlooked language used by us in our decision in *In re Hunter's Estate,* 147 Wash. 216, 265 Pac. 466, particularly relied upon by counsel for appellant, reading as follows:

"The statute is plain. It speaks of 'relief of the aged, indigent and poor people,' that is, those in need of aid and assistance not to be had in the ordinary way; 'maintenance of sick or maimed,' *that is, those who cannot be supported or maintained as they reasonably should be without charity;* 'the support or education of orphans or indigent children,' that is, aid and help to children who otherwise would be destitute of sustenance and mental advantages."

We have italicized the language particularly relied upon as indicating the view of this court that the words "maintenance of sick or maimed," as used in this exemption statutory provision, mean only sick and maimed to be supported or maintained wholly by benevolence or charity in the popular sense. There was no question presented in that case calling for the giving of a limited meaning to the words "maintenance of sick or maimed." We do not think the language of that decision should be now held to be controlling in our present inquiry.

The other testamentary gift here in question made by Mr. Rust to the corporation is of a residuary character; that is, the remainder of his estate left after the satisfying of all his specific gifts. With reference thereto, he directs:

"The net income from said residue shall be allowed to accumulate in The National Bank of Tacoma, Tacoma, Washington, its successor or successors, until

such accumulations and the earnings thereof shall be sufficient to establish and equip in the Tacoma General Hospital of Tacoma, Washington, a free ward in or wing to the hospital building, under such plans and of such capacity and with such equipment as may be designated by my trustee.''

This gift is manifestly clearly within the charitable purpose of the corporation. It follows, we think, that what we have already said with reference to the first gift calls for the conclusion that this gift must also be held to be exempt from inheritance tax as held by the trial court.

We conclude that the judgment of the trial court exempting both gifts from the inheritance tax must be affirmed. It is so ordered.

TOLMAN, C. J., MITCHELL, HOLCOMB, and HERMAN, JJ., concur.