Rafael Buscaglia, Tesorero de Puerto Rico, peticionario, *v.* Tribunal de Contribuciones, demandado; Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, interventora.

Núm. 82.—*Sometido:* Mayo 6, 1946. *Resuelto:* Noviembre 20, 1946.

660

*Hon. Procurador General Interino Luis Negrón Fernández (E. Campos· del Toro, Ex-Procurador General,* en el alegato) y *Carlos Santana Becerra, Procurador General Auxiliar,* abogados del peticionario; *Damián Monserrat, Jr., Gabriel de la Haba* y *Rafael Baragaño, Jr.,* abogados de la interventora, querellante en el pleito principal.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

A los fines de la contribución sobre la propiedad correspondiente al año fiscal 1941–42 el Tesorero tasó un predio de terreno de 18.70 cuerdas y los edificios enclavados en el mismo pertenecientes a la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico—que en adelante llamaremos el Auxilio Mutuo—ascendente dicha tasación a $142,210. El Tribunal de Contribuciones sostuvo la contención del Auxilio Mutuo al efecto de que cinco cuerdas de este terreno y los edificios en ellas enclavados estaban exentos de contribución sobre la propiedad en virtud del artículo 291(e) del Código Político, según fué enmendado por la Ley núm. 12, Leyes de Puerto Rico, Sesión Extraordinaria de 1933, que establece esta exención para los edificios y superficie de terreno cuya extensión no exceda de cinco cuerdas en que dichos edificios estén enclavados y que se utilicen para

fines caritativos. Expedimos el auto de *certiorari* al solicitarnos el Tesorero que revisáramos esta decisión.

■■ El Auxilio Mutuo se organizó en el 1883 bajo el régimen español. Su reglamento ha estado en vigor sin sufrir enmienda alguna desde el año 1900. Su artículo primero indica los fines para los cuales se organizó: (1) fomentar la unión entre los españoles y sus descendientes, sostener sus sentimientos religiosos, y ejercer la caridad y mutuo auxilio; (2) proveer a sus asociados y españoles indigentes cuidado y atención en casos de enfermedad o desgracia; (3) proveer transportación a España a aquellos asociados que carezcan de medios para hacerlo por su cuenta en aquellos casos de enfermedad en que el viaje fuese necesario para su curación; (4) proveer sepultura a sus socios y a los españoles indigentes; (5) socorrer por una sola vez con un donativo a las familias de los finados que se hallen verdaderamente necesitados, pero "Estos socorros y todo acto de beneficencia se acordarán en cada caso por la Junta Directiva, siempre que los recursos de la Sociedad lo permitan, sin comprometer el auxilio mutuo que se deben sus asociados."

El artículo 2 provee el establecimiento de un hospital para tratamiento de los asociados enfermos. El artículo 3 dispone que también recibirán tratamiento en el hospital los españoles indigentes. El artículo 4 autoriza a la Sociedad a prestar asistencia médica a enfermos que no sean asociados con sujeción a la tarifa establecida, siempre y cuando que esto no afecte la preferente atención de los socios. El artículo 7 dispone que no se admitirá a un paciente que no sea miembro hasta que los médicos informen a la Junta la enfermedad que padezca y el tiempo que necesitarán para curarlo; y dos miembros certificarán el estado de pobreza de los pacientes indigentes, pudiendo la Junta conceder o negar su ingreso.

El artículo 9 provee que la Sociedad se sostendrá mediante (1) la cuota inicial y cuotas mensuales a pagarse por sus socios, (2) todo ingreso extraordinario y (3) donativos de

sus simpatizadores. El artículo 11 dispone que en caso de acordarse la disolución de la Sociedad, se entregarán sus fondos al Cónsul de España para dedicarlos a la beneficencia española.

El artículo 14 dispone que sus socios serán los españoles y sus descendientes que residan en la Isla. En virtud del artículo 15 la Junta tiene poder para aceptar o rechazar solicitudes de admisión por votación secreta. El artículo 16 le concede a los socios el derecho a usar las comodidades del hospital de la Asociación y el derecho a tratamiento, siempre que presenten el recibo del mes anterior al en que se solicita el servicio.

■ Bajo nuestra ley no es suficiente que los bienes pertenezcan a una institución organizada para fines caritativos; se necesita que de hecho se usen para fines caritativos. Por tanto pasemos a las actividades del Auxilio Mutuo.

■ Surge de la prueba que el Auxilio Mutuo opera un hospital con un cuerpo de empleados que reciben la correspondiente paga. Durante el año 1941, se dieron de alta 1,361 pacientes, de los cuales 958 eran socios que pagaban sus cuotas, 357 no eran socios pero casi todos eran familiares de socios y en tal carácter pagaban las tarifas establecidas menos el descuento, y 46 eran pacientes indigentes. Durante dicho año, 6,732 pacientes visitaron el hospital, de los cuales 6,432 eran socios, 142 no eran socios y pagaron tarifas según se ha indicado, y 158 eran pobres. Estas cifras son un cuadro típico de la asistencia prestada durante el 1941 y otros años.

Las operaciones del Auxilio Mutuo resultaron en déficit hasta el 1935 ó 1936. Desde dicha fecha ha tenido beneficios. En 1941 la sociedad tenía un activo de $797,000, del cual $85,000 eran efectivo, $626,000 eran bienes inmuebles y $58,000 consistían de moblaje. En 1942 tuvo una ganancia de $36,000. Durante dicho año realizó cobros por $161,000, de los cuales $114,000 eran cuotas, cobradas a más de 3,000 socios a razón de $3 mensuales.

Para el 1944 el activo de la sociedad era de $897,000, del cual $127,000 eran efectivo, $60,000 eran bonos de guerra y $626,000 bienes inmuebles. Para 1936 se saldó en su totalidad una hipoteca de $200,000 otorgada en 1927 para la construcción de uno de sus edificios. Para el 1944 se habían acumulado $200,000 más, que estaban asignados al mejoramiento y expansión de las comodidades de la asociación.

Nunca se distribuyen los beneficios entre los socios. Los cobros se dedican exclusivamente a los servicios prestados por el Auxilio Mutuo y al mejoramiento y expansión de sus comodidades, con la excepción de algunos pequeños donativos de caridad.

A los pacientes de emergencia se les suministra tratamiento gratis; los pacientes privados en su mayoría son familiares de los socios, y algunos que no son parientes sino recomendados por los socios; los pacientes de caridad son casi todos españoles indigentes, si bien en algunos casos excepcionales se ha dado tratamiento a puertorriqueños; y los socios reciben toda la hospitalización, servicios médicos y quirúrgicos que necesiten a cambio de sus cuotas mensuales, que constituyen el grueso de sus entradas.

En los Estados Unidos son corrientes los estatutos que eximen de contribución sobre la propiedad los bienes usados para fines caritativos. Las cortes han resuelto cientos de disputas bajo estos estatutos. Anotaciones, 34 A.L.R. 634; 62 A.L.R. 328; 108 A.L.R. 284. Véase también, 22 A.L.R. 907; 83 A.L.R. 773. Pero no podemos decir que predomina alguno de estos casos. Los estatutos difieren en su lenguaje en diferentes estados. Y en última instancia cada caso debe resolverse por sus propios hechos—el uso específico de determinado predio de terreno.

Nuestro estatuto no dice qué es un fin caritativo. Tampoco expresamente exime a los hospitales propiamente dichos de la contribución sobre la propiedad. Y el funcionamiento

de un hospital no es intrínsecamente una empresa caritativa —muchos hospitales son caritativos; muchos son estrictamente, o en su mayor parte, de carácter comercial. Sin embargo, no abrigamos duda alguna de que el proporcionar hospitalización o tratamiento médico gratis a un paciente pobre es un acto de caridad. Anotación, *Hospital as within tax exemption provision not specifically naming hospitals,* 144 A.L.R. 1483. Y existe cierto número de casos que resuelven que un hospital operado por una institución que no se organizó ni opera con fines de lucro o con alguna otra ventaja privada, usa su propiedad para fines caritativos no obstante el hecho de que algunos o aun la mayoría de sus pacientes pagan por el tratamiento que reciben porque pueden hacerlo, siempre y cuando que los fondos recibidos en esta forma se dediquen a fines caritativos. *Benton County* v. *Allen,* 133 P.2d 991 (Ore., 1943); *Order of Sisters of St. Joseph* v. *Town of Plover,* 1 N.W.2d 173 (Wis., 1941); 144 A.L.R. 1483; 34 A.L.R. 634, 637–38; 62 A.L.R. 328, 330; 108 A.L.R. 284, 286; 3 Scott *on Trusts,* sec. 372.1, pág: 1997, sec. 376, págs. 2032–33.

La fórmula a aplicarse por tanto no es si se suministra tratamiento gratis a los pacientes. Más bien la cuestión a determinarse es si el objeto primordial de la institución es la práctica de la caridad. Un hospital puede tener fines caritativos aun cuando muchos de sus pacientes paguen por el tratamiento. Del mismo modo, un hospital no es caritativo, a los fines de la exención contributiva, cuando su objeto primordial es el lucro o la ventaja privada, por la simple razón de que incidentalmente presta algunos servicios de caridad. *Prairie Du Chien San. Co.* v. *City of Prairie Du Chien,* 7 N.W. 2d 832 (Wis., 1943); *State* v. *Willmar Hospital,* 2 N.W.2d 564 (Minn., 1942); *Gray St. Infirmary* v. *City of Louisville,* 65 S.W. 11 (Ky., 1901); casos anotados en 144 A.L.R. 1483, 1489–91; 34 A.L.R. 634, 646–52; 62 A.L.R. 328, 331–33; 108 A.L.R. 284, 288–91.

¿Funciona el Auxilio Mutuo con fines caritativos? Los abogados del Auxilio Mutuo llaman la atención a algunos casos, especialmente el de *Portland Hibernian Ben. Soc. v. Kelley*, 42 P. 3 (Ore., 1895), que aparentemente resuelven que cuando en casos como éste el estatuto no exige que el fin caritativo sea público, las sociedades que limitan sus actividades al pago de beneficios de muerte o enfermedad a sus socios y familiares, están no obstante exentas de contribución en calidad de empresas caritativas privadas más bien que públicas. Pero cualquiera que sea la diferencia entre caridad pública y privada, somos de opinión que la esencia de la caridad, ora sea pública ora sea privada, es que el donante y el agraciado no sean idénticos. "La caridad empieza por casa" es un aforismo que no está supuesto a leerse literalmente cuando se interpreta un estatuto de exención contributiva. Y la prueba demuestra fuera de toda duda que el Auxilio Mutuo se estableció originalmente y desde entonces ha funcionado cooperativamente con el objeto primordial de proporcionar ventajas o beneficio mutuo a sus propios socios de cuota, más bien que a los comparativamente pocos españoles pobres que reciben tratamiento gratis.

No podemos ver la diferencia, a los fines de este caso, entre esta sociedad de beneficio mutuo y una sociedad funeraria, un club automovilista, una sociedad cooperativa comercial o de ventas, una compañía de seguro mutuo, o cualquier otra empresa cooperativa, a la cual los socios contribuyen a un fondo común que se emplea para proporcionar servicio a sus miembros. Una pequeña cantidad de trabajo caritativo o de emergencia que se proporciona gratuitamente no convierte tales instituciones en empresas caritativas. Resolver lo contrario sería permitir a cualquier persona que opere una reconocida clínica comercial privada que evada la contribución realizando unas pocas actividades caritativas que cuesten menos que la contribución. Desde luego no le atribuímos al Auxilio Mutuo tan cínico propósito.

La caridad que proporciona a los españoles pobres indudablemente es hecha de buena fe. Pero esto no altera el hecho de que esta actividad caritativa es incidental al fin primordial del Auxilio Mutuo—el fin no caritativo de proporcionar a sus miembros a bajo costo un buen servicio médico mediante el dominio y operación cooperativa de un hospital. Toda vez que esto equivale a operarlo para ventaja privada, la propiedad aquí envuelta no está siendo usada para fines caritativos.

Si el Auxilio Mutuo no realizara ninguna actividad caritativa, no podría alegar con éxito que su objeto de proporcionar servicios médicos mutuos a sus socios de cuota era caritativo. Está en la misma posición que los hospitales comerciales privados que ofrecen hospitalización o tratamiento cuando sea necesario al público en general por cierta cuota fija a pagarse por meses o años. El hecho de que el Auxilio Mutuo sea poseído cooperativamente por sus socios más bien que por un médico no altera la naturaleza de sus operaciones. Y unas pocas actividades caritativas realizadas ya sea por el Auxilio Mutuo o por tal hospital privado, no nos lleva a la conclusión de que su propiedad se usa para fines caritativos.

Arguye el Auxilio Mutuo que el fin primordial de la propiedad no debe ser el factor decisivo en este caso, debido a que la mayoría de los casos resueltos a ese efecto surgieron bajo estatutos que exigen un fin exclusivamente caritativo,([1]) mientras que nuestro estatuto omite la palabra "exclusivamente". Es difícil determinar en la mayoría de estos casos cuánta importancia le dieron las cortes al uso de la palabra "exclusivamente". De cualquier modo, para decidir el presente caso basta decir que, a pesar de la omisión de la palabra "exclusivamente" de nuestro estatuto, no podemos con-

---

([1]) Por ejemplo, *Turnverein "Lincoln"* v. *Board of Appeals*, 192 N.E. 780 (Ill., 1934); *People* v. *Passavant Memorial Hospital*, 173 N.E. 770 Ill., 1930); *People* v. *Rockford Masonic Temple Bldg. Ass'n*, 181 N.E. 428 (Ill., 1932); *People* v. *Jessamine Withers Home*, 143 N.E. 414 (Ill., 1924); *Rogers Memorial Sanitarium* v. *Town of Summit*, 279 N.W. 623 (Wis., 1938).

cluir que nuestra Legislatura tuvo por miras eximir, como propiedad que se usa para fines caritativos, un hospital que es operado primordialmente como una sociedad de beneficio mutuo, por la sencilla razón de que incidentalmente dió tratamiento gratis a un número comparativamente pequeño de pacientes pobres.

Estamos de acuerdo con los casos citados por el Auxilio Mutuo al efecto de que una institución no deja de ser caritativa, a pesar del hecho de que sus actividades estén limitadas a una clase, secta o grupo. *Powers v. First Nat. Bank of Corsicana, Tex.*, 137 S.W.2d 839, 846–47 (Tex., 1940); *Widows' & Orphans' Home of O. F. v. Commonwealth,* 103 S.W. 354 (Ky., 1907); *In re Henderson's Estate,* 112 P.2d 605 (Calif., 1941); 34 A.L.R. 634, 645–46; 62 A.L.R. 328, 331; 108 A.L.R. 284, 288. La dificultad estriba aquí en encontrar la actividad caritativa. El Auxilio Mutuo está compuesto de un grupo limitado de socios que se dedican a una actividad cooperativa de beneficio mutuo, no de caridad.

Si bien no son de estricta aplicación al presente, el razonamiento y la decisión de los casos de *Bistline v. Bassett,* 272 P. 696 (Idaho, 1928) e *In re Farmers' Union Hospital Assn'n,* 126 P.2d 244 (Okla., 1942), sostienen la conclusión a que hemos llegado. Y a las organizaciones casi idénticas al Auxilio Mutuo se les ha negado exención de contribuciones sobre seguro social y de desempleo bajo estatutos que eximen de tales contribuciones a las organizaciones con fines exclusivamente[2] caritativos. *La Societe Francaise, etc. v. California Employ. Com.,* 133 P.2d 47 (Calif., 1943); *United States v. La Societe Francaise De Bien. Mut.,* 152 F.2d 243 (C. C. A. 9, 1945); *Hassett v. Associated Hospital Service Corporation,* 125 F.2d 611 (C. C. A. 1, 1942), comentado en 55 Harv. L. Rev. 1055; *Smith v. Reynolds,* 43 F. Supp. 510 (D. Minn., 1942). *Cf. Boston Chamber of Commerce v. As-*

---

[2] Como ya se ha indicado, no consideramos que la ausencia de la palabra ''exclusivamente'' de nuestro estatuto, sea decisiva bajo las circunstancias de este caso.

*sessors of Boston,* 54 N.E.2d 199 (Mass., 1944), anotado en 152 A.L.R. 181:

Describiendo la naturaleza de tales organizaciones la corte dijo en el primer caso de *La Societe Francaise,* que (pág. 47) ''cuando la gente se asocia para comprar tratamiento médico en caso de enfermedad, esta acción es una 'empresa comercial' más bien que una 'actividad caritativa' y los beneficiarios no consideran los beneficios derivados de la misma como un 'fin caritativo'.'' En el caso de *Hassett* nuestra Corte de Circuito dijo a la pág. 614: ''Es difícil distinguir entre la corporación demandante y una compañía de seguro mutuo o de un plan de seguro para empleados. Nos confrontamos aquí con lo que es esencialmente un contrato comercial bajo el cual un número de personas se han unido para comprar, al tipo más bajo posible, tratamiento médico en caso de enfermedad o accidente.'' Y en el segundo caso de *Societe Francaise* la corte empleó un lenguaje similar a la pág. 245: ''Al recibir el mejor tratamiento al más bajo costo, ningún miembro de la Sociedad consideraría que recibía una caridad, sino más bien que disfrutaba del beneficio de una decisión sabia al decidir hacerse miembro de una organización que, mediante sus actividades comerciales bien dirigidas, había conseguido para él dichos beneficios adicionales.''

Finalmente, en el caso de *Reynolds* la corte indica que, como en el presente caso, unas cuantas actividades caritativas no alteran la naturaleza de tal empresa, diciendo a la pág. 514: ''En la prueba nada hay que indique que la mayor parte de las actividades de la Asociación eran caritativas o benéficas. Si bien es verdad que algunos casos de caridad fueron atendidos, ese hecho por sí solo no convierte a la Asociación en una organización caritativa.''

No creemos que sea decisivo el hecho de que los socios del Auxilio Mutuo no reciban dividendo alguno. Si bien sus cuotas no les reportan beneficios propiamente dichos, sí obtienen servicios médicos mejores y más baratos en virtud

de las cuotas que como miembros pagan. Sustancialmente esto redunda en una ventaja privada para los socios como redundaría el pago de las ganancias en forma de dividendos. *United States* v. *La Societe Francaise de Bien. Mut.*, supra, pág. 245; *Smith* v. *Reynolds*, supra, pág. 514.

El Tribunal de Contribuciones descansó en casos que resuelven que los hospitales funcionan para fines caritativos no obstante el hecho de que la mayoría de sus pacientes pagan por los servicios prestados. *Lutheran Hospital Ass'n of South Dakota* v. *Baker*, 167 N.W. 148 (S. D., 1918); *In re Rust's Estate*, 12 P.2d 396 (Wash., 1932); *Corporation of Sisters of Mercy* v. *Lane County*, 261 P. 694 (Ore., 1937); *Board of Com'rs of Tulsa County* v. *Sisters of The Sorrowful Mother*, 283 P. 984 (Okla., 1930). Ya hemos distinguido dichos casos. Estas organizaciones son consideradas como caritativas debido a que lo pagado por los pacientes pudientes se emplea para hacer frente a los gastos incurridos en el tratamiento de los pacientes pobres, sin que persona alguna reciba ganancia o beneficio alguno. Aquí los cobros son utilizados primariamente—y casi en su totalidad—para el beneficio de los socios del Auxilio Mutuo y sus familiares pudientes quienes, mediante su cooperativa, reciben un servicio médico mejor y más barato.

Los casos de *Candal et al.* v. *Soc. Esp. de Auxilio Mutuo*, 37 D.P.R. 874, y *Carrasquillo* v. *Am. Missionary Association*, 61 D.P.R. 867, no son de aplicación. En dichos casos estaba envuelta una cuestión diferente que nada tiene que ver con el significado del artículo 291(e) del Código Político.

Debemos confesar que entre los innumerables casos que encontramos sobre esta materia, hay algunos que emplean lenguaje favorable al Auxilio Mutuo. Nuestra Corte de Circuito ha resuelto dos casos que parecen difíciles de reconciliar. Compárese *Hassett* v. *Associated Hospital Service Corporation*, supra, con el de *United States* v. *Proprietors of Social Law Library*, 102 F.2d 481 (C. C. A. 1, 1939). Pero

creemos que el principio que hemos podido entresacar de este confuso laberinto está sostenido tanto por los casos como por el propósito de la Legislatura al conceder esta exención.

Podría ser una sabia política social el estimular las cooperativas en el campo médico y en otros campos eximiéndolas de todas o parte de las contribuciones. Nuestra Legislatura recientemente autorizó la organización de ciertas clases de sociedades cooperativas. y les concedió exenciones de contribuciones sobre la propiedad y sobre ingresos. Secciones 26, 27, Ley núm. 291, Leyes de Puerto Rico, 1946 (pág. 687). El Congreso y nuestra Legislatura han eximido ambos de la contribución sobre ingresos (a) a ciertas clases de sociedades mutuas o cooperativas, incluyendo aquéllas que proveen para el pago de beneficios de enfermedad, y (b) a corporaciones organizadas y operadas exclusivamente con fines caritativos. 26 U.S.C.A. sec. 101(3), (6); sec. 29, Ley núm. 74, Leyes de Puerto Rico, 1925 (pág. 401). Cuando el Congreso incorporó a "Group Hospitalization, Inc." para que funcionara en el Distrito de Columbia, le concedió una exención de todas las contribuciones con excepción de la contribución sobre propiedad inmueble. 53 Stat. 1412, Part 2. No comentamos la cuestión de si bienes pertenecientes a sociedades de servicio de hospital como la Cruz Azul (Véanse Ley núm. 152, Leyes de Puerto Rico, 1942 ((1) pág. 829) y Ley núm. 466, Leyes de Puerto Rico, 1946, pág. 1359), están exentos de contribuciones sobre la propiedad. Suponiendo, sin decidirlo, que no lo estén, dichas organizaciones y el Auxilio Mutuo podrían convencer a la Legislatura que conviene al interés público el concederles a ellas y al Auxilio Mutuo exenciones de contribuciones sobre la propiedad. Toca a la Legislatura resolver esto. Pero no podemos decidir que los bienes del Auxilio Mutuo se usan para fines caritativos y están por tanto exentos de contribuciones sobre la propiedad bajo el artículo 291 (e) del Código Político

cuando surge del récord que el Auxilio Mutuo funciona principalmente como una sociedad de auxilio mutuo para beneficio de sus socios de cuota más bien que como una institución caritativa.

*La decisión del Tribunal de Contribuciones será revocada y se devolverá el caso para ulteriores procedimientos no inconsistentes con esta opinión.*

Opinión disidente emitida por el Juez Asociado Sr. Todd, Jr.

Noviembre 22, 1946

Como se admite en la opinión de la mayoría, la jurisprudencia sobre esta materia está dividida. He leído los casos citados por el Tribunal de Contribuciones y creo justifican y sostienen la conclusión a que llegó. La ley no requiere que la institución esté dedicada *exclusivamente* a fines caritativos para estar exenta y, aun bajo estatutos que así lo proveen se ha resuelto que lo son y especialmente cuando la institución es una organizada para fines no pecuniarios y los socios no reciben dividendo alguno.

Véanse al efecto *In re Rust's Estate*, 12 P.2d 396 (Wash. 1932); *Lutheran Hospital Assn'n of South Dakota* v. *Baker*, 167 N. W. 148 (S. D., 1918). (En este último caso el 95 por ciento de los pacientes pagaba y el 5 por ciento era de beneficencia y aun cuando la ley usaba las palabras "exclusivamente usadas para fines caritativos.") *Corporation of Sisters of Mercy* v. *Lane County*, 261 P. 694 (Or. 1927); *Board of Commissioners of Tulsa County* v. *Sisters of the Sorrowful Mother*, 283 P. 984 (Okla. 1930); *Powers et al.* v. *First Nat. Bank of Corsicana, Tex.*, 137 S.W.2d 839 (Tex. 1940); *Widows' and Orphans' Home of O. F.* v. *Commonwealth*, 103 S. W. 354 (Ky. 197); *In re Henderson's Estate*, 112 P.2d 605 (Cal. 1941); *United States* v. *Proprietors of Social Law Library*, 12 F.2d 481 (C.C.A. 1, 1939); las Monografías en 34 A.L.R. 641; 62 A.L.R. 331 y 108 A.L.R. 288, y especial-

'mente la opinión disidente del Juez Magruder en el caso de *Hasset* v. *Associated Hospital Service Corporation,* 125 F.2d 611 (C. C. A. 1, 1942).