CATHOLIC UNIVERSITY OF PUERTO RICO (UNIVERSIDAD CATÓLICA DE PUERTO RICO), demandante y recurrida, v. SECRETARIO DE HACIENDA, demandado y recurrente.

*Número:* R-64-236      *Resuelto:* 6 de mayo de 1966

*J. B. Fernández Badillo, Procurador General,* y *Elpidio Arcaya, Procurador General Auxiliar,* abogados del recurrente; *José Guillermo Vivas, Jorge Lucas P. Valdivieso, Jr.,* y *Carlos Martínez Texidor,* abogados de la recurrida.

Sala Segunda integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Santana Becerra, Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

La Universidad Católica de Puerto Rico, corporación con fines educativos y no pecuniarios organizada bajo las leyes del Estado de Nueva York es dueña de la estación radio-emisora "W.E.U.C." Opera dicha estación a través de una entidad subsidiaria organizada también sin fines pecuniarios bajo las leyes de Puerto Rico, denominada "Catholic University of Puerto Rico Service Association". La estación radio-difusora está ubicada dentro del campus de la Universidad.

Para el año 1960–61 el Secretario de Hacienda impuso contribución territorial sobre la propiedad de dicha estación, por el monto de $290.17. La demandante satisfizo el primer semestre y luego reclamó la devolución de la contribución pagada a base de que la propiedad estaba exenta de tributación. El Secretario de Hacienda se negó a devolver y la demandante interpuso este recurso judicial.

La demandante alegó en su demanda que la estación se usa esencial, principal y predominantemente para la difusión

de programas culturales, motivados por el fin primordial de adelantar la educación de los estudiantes que asisten a la Universidad Católica y también de la comunidad en general. Que los programas son de música clásica y de música selecta, de educación literaria, científica y religiosa, y de adelanto cultural. El Secretario de Hacienda negó los anteriores hechos y alegó en relación con los mismos "que si bien es cierto que la difusión de programas culturales es un fin primordial de la estación de radio W.E.U.C., no es menos cierto que la difusión de programas comerciales pagados es otro fin esencial de dicha estación".

Alegó también la demandante que incidental a la radiodifusión de dichos programas, con el único fin de sufragar los gastos, la estación solicitaba la cooperación económica de un número limitado de personas y a cambio de dicha cooperación se informaban sus nombres como patrocinadores de los programas sin que la demandante recibiera beneficio alguno pecuniario. Estos hechos fueron igualmente negados por el Secretario de Hacienda. Trabada así la contienda, controvertidos los hechos esenciales para la aplicación del derecho envuelto, la demandante no practicó prueba oral. La cuestión litigiosa quedó sometida a base de prueba documental consistente de tres catálogos generales de la Universidad Católica para los años 1960 al 1962; un estado financiero de la referida estación correspondiente al año económico 1960–61, y de una comunicación presentada como prueba de ambas partes fechada 11 de diciembre de 1959 dirigida al Secretario de Hacienda por el Canciller de la Universidad Católica Sr. McMannus. En esta comunicación informa el Canciller Sr. McMannus al Secretario de Hacienda que en mayo de 1958 pusieron en funcionamiento como una actividad de la Universidad y como un servicio cultural y educativo para los estudiantes y para la comunidad, la Estación de radio W.E.U.C., localizada en los terrenos de la Universidad

Católica; que comenzando dicha actividad pidieron y obtuvieron una licencia comercial de la F.C.C.; que la razón que tenían para hacer eso era evidente; los costos de operar la estación durante 15 horas diarias eran fuertes. A la vez, debido a sus esfuerzos para mantener el costo de educación para los estudiantes lo más bajo posible, el ingreso de la Universidad no era suficiente para permitir la operación de la estación de radio sobre una base no-comercial. Que por lo tanto, para poder ofrecer este servicio cultural y educativo a la comunidad se habían visto obligados a buscar anuncios pagados. En el estado financiero aludido aparece que durante el año que terminó en junio 30, 1961, el mismo en que se hizo la imposición contributiva, la estación tuvo ingresos por $17,266.94, gastos por $15,102.03 y un exceso de ingresos sobre gastos de $2,164.91.

Con la anterior prueba la Sala sentenciadora declaró con lugar la demanda. Fue de opinión que para determinar el derecho a la exención contributiva debía considerarse el uso principal y predominante de la propiedad y no su uso incidental; que la estación W.E.U.C. tenía como uso predominante el promover y adelantar la educación de la Universidad Católica y del público en general; y que en este caso ni la Universidad Católica ni la estación operan como empresas comerciales. (1)

---

(1) La carta del Canciller Sr. McMannus dice:

"In May of 1958, we put into operation as an *activity of the University and as a cultural and educational service to the students and the community,* the radio station W E U C, *located on the grounds of the Catholic University.*

"In beginning this service and activity, we asked for and obtained a commercial license from the FCC. Our reason for doing this is evident. The costs of operating a radio station for 15 hours daily are heavy. At the same time, and due to our efforts to keep the costs of education as low as possible for our students, the income of the University is not sufficient to permit the operation of the Radio Station on a non-commercial basis. Therefore, in order to be able to offer this educational and cultural service to the Community, we have been forced to seek for paid advertising." (Énfasis nuestro.)

El Art. 291 del Código Político según se aplica en este caso dispone que estarán exentas de tributación para la imposición de contribuciones las propiedades siguientes:

"(e) Todo edificio, incluyendo el equipo y mobiliario dentro del mismo, utilizado y destinado exclusivamente para el culto religioso, así como para casas parroquiales dedicadas exclusivamente a habitación de y en donde constantemente vivan párrocos, ministros o sacerdotes; todo edificio, incluyendo el equipo y mobiliario dentro del mismo, destinado a logia másonica u 'odfélica' o centro de estudios teosóficos o psicológicos o utilizado para centro de educación literaria y científica, o a centro caritativo; todo edificio, incluyendo el equipo y mobiliario dentro del mismo, que sea utilizado y destinado exclusivamente, para organizaciones del trabajo, centro de recreo, esparcimiento y cultura y trato social y que mantenga permanentemente un gabinete de lectura de periódicos, magazines y folletos, y de prensa ilustrada en general, así nacional como extranjera; y toda superficie de terreno, cuya extensión no exceda de cinco cuerdas, en el cual dicho edificio o edificios esté o estén construidos; siempre que tales terrenos y edificios sean propiedad absoluta de la organización o institución que solicita la exención y no sean arrendados ni utilizados, parcial o totalmente, con el fin de que produzcan un beneficio pecuniario, ya al arrendador, ya al arrendatario; y siempre que dicha institución no tenga por objeto un beneficio pecuniario; Disponiéndose que en los casos de instituciones que se dediquen a la enseñanza no regirá la limitación de cinco (5) cuerdas anteriormente consignada, y la exención de contribuciones sobre el terreno se extenderá hasta un máximum de cien (100) cuerdas siempre que tales terrenos sean utilizados en relación a la enseñanza."

Según la prueba en el récord se trata de propiedad utilizada para dar un "servicio" cultural y educativo a los estudiantes de la Universidad y a la comunidad, mediante programas de radio. La prueba no nos permite saber si la Universidad hacía o no parte de su labor de enseñanza propiamente por este medio. Aceptando que la Estación W.E.U.C. es utilizada "para centro de educación literaria y científica", la propiedad tiene derecho a exención contributiva (1) si

pertenece a una organización o institución sin fines de lucro y (2) si no es arrendada ni utilizada, total o parcialmente, con el fin de que produzca un beneficio pecuniario.

Acorde con las anteriores disposiciones de la ley aplicable, el derecho a exención reclamado por la demandante no se resuelve precisamente a base del criterio de un uso predominante o primario o de un uso incidental de la propiedad para el fin cultural deseado. El criterio del uso principal o incidental ha surgido judicialmente como un producto de interpretación y aplicación de aquellas disposiciones de ley que requieren un uso o destino exclusivo de la propiedad para los fines señalados. Cf. *Buscaglia, Tes.* v. *Tribl. de Contribuciones*, 66 D.P.R. 659, págs. 666–667 (1946); *Club Yaucano* v. *Srio. Hacienda*, 83 D.P.R. 623, pág. 630 (1961) y casos ahí citados. Cf. *University Club* v. *Lanier*, 161 So. 78 (Fla.); *Cardinal Pub. Co.* v. *City of Madison*, 237 N.W. 265 (Wis.); cf. *State* v. *Bridges*, 21 So.2d 316 (Ala.); *Smith* v. *Feather*, 229 S.W.2d 417.

■ Como cuestión de realidad se observa que el Art. 291(e), distinto a como dispone en relación con el uso o destino de otras propiedades que menciona, se refiere a un edificio y sus muebles "utilizado para centro de educación literaria y científica." Si tal fuera el único requisito de ley para obtener la exención, el factor de si esa utilización es principal o predominante o si sólo es incidental no dejaría de ser pertinente, aunque no tendríamos en el récord los elementos de prueba necesarios para evaluar tal situación de hecho. Sin embargo, es requisito a cumplirse, aparte de que pertenezca a una organización o institución sin fines de lucro como incuestionablemente lo es la Universidad en este caso, el que la propiedad no sea arrendada ni utilizada *en todo o en parte*, con el fin de producir un beneficio pecuniario ya al arrendador, ya al arrendatario.

■ Hasta cierto punto parece ser un contrasentido que siendo requisito el que la propiedad pertenezca absolutamente

a una institución sin fines pecuniarios se prohíba, para fines de la exención, que en todo o en parte se utilice para producirle un beneficio pecuniario a ella. Se explica, porque nuestro estatuto históricamente ha hecho recaer la exención sobre la propiedad en sí, a base del destino y uso de la misma. Distinto a lo que ocurre en muchas otras jurisdicciones, no ha concedido la exención a la institución dueña de la propiedad por razón solo de su organización de fines no lucrativos y del propósito que persigue con sus actividades, con abstracción de la manera en que use o disponga de su propiedad.

Cuando adoptamos originalmente el Art. 291 (e) en el año 1902, concedía exención al edificio utilizado y destinado exclusivamente para culto religioso y sus muebles, y al edificio utilizado para centro de educación, literario, científico o caritativo y sus muebles. No se exigía el requisito de que la propiedad perteneciera a una institución sin fines pecuniarios, pero sí se determinó desde entonces el que no se arrendara ni utilizara "de otra manera" para producir un beneficio pecuniario al arrendador o al arrendatario. Desde un principio se tuvo en cuenta la propiedad y su utilización, no su dueño. En 1925, al incluirse para exención otras propiedades por la Ley Núm. 42 de 7 de julio de ese año, se dispuso por primera vez que éstas deberían pertenecer a una institución sin fines pecuniarios, y no obstante, el Legislador no alteró la prohibición original ya mencionada. En *School of Commerce* v. *Tribl. Contribuciones*, 77 D.P.R. 875 (1955), interpretamos el Art. 291 (e) antes de su enmienda por la Ley Núm. 266 de 10 de mayo de 1950, en el sentido de que una propiedad utilizada para centro de educación debía pertenecer a una institución sin fines pecuniarios, aun cuando el estatuto expresamente así no lo exigía. En 1950, por la Ley Núm. 266 el Legislador expresamente ya lo había dispuesto así, e hizo más restrictiva la prohibición del uso, para disponer ahora que la propiedad no fuera arrendada

ni utilizada *"total o parcialmente"* con el fin de producir un beneficio pecuniario.

Ante ese historial es clara y firme la intención legislativa de que la propiedad a la cual concede la exención no se utilice para producir un beneficio pecuniario, aun cuando ese beneficio hubiere de ser para una institución que a la vez no tiene fines lucrativos. Al igual que nosotros el Legislador tuvo que ser consciente de esta situación y no obstante lo ha dispuesto así. Probablemente no creyó ser buena norma que bienes exentos de tributo se pusieran en el flujo del comercio humano a producir beneficio económico en competencia con aquellos que pagan contribuciones. Casi es innecesario repetir, lo hemos dicho muchas veces y está el principio bien sentado en la doctrina, que este estatuto debe ser aplicado restrictivamente, sin que vayamos más allá para reconocer la exención de donde fue el Legislador o que alteremos, por vía de interpretación, condiciones claramente impuestas. Según se observa en *Snyder* v. *Town of Newtown,* 161 A.2d 770 (Conn.), la exención contributiva tiene el efecto de ser una asignación de fondos públicos porque la contribución que no paga el exento pesa sobre los demás contribuyentes.

En *Cámara de Comercio* v. *Tribl. de Contribuciones,* 67 D.P.R. 427 (1947), dijimos, pág. 431: "No sólo opinamos que el edificio de la Cámara de Comercio no es utilizado y destinado exclusiva y totalmente a los fines a que hace referencia el estatuto, sino que además creemos que al arrendarse la planta baja del mismo en la forma que ya hemos mencionado se está obteniendo un beneficio pecuniario por la arrendadora". La arrendadora, Cámara de Comercio, era ahí una institución sin fines pecuniarios o de lucro. Y más adelante: "El hecho de que el producto total de las rentas se utilice por la peticionaria para amortizar la deuda que pesa sobre el edificio no altera en absoluto la situación." Cf. *Columbus Youth League* v. *County Board of Revision,*

174 N.E.2d 110 (Ohio), y autoridades ahí recopiladas al efecto de que en situaciones de ley como la de nuestro estatuto el uso a que se destinen los beneficios que produce la utilización de la propiedad no es el factor determinante de la exención.

■ Aun cuando fuera para lograr el propósito de transmitir programas culturales, la carta del Canciller Sr. McManus no deja lugar a dudas que desde un principio se dispuso, evidentemente por razones económicas, que la Estación se utilizara en un aspecto comercial para lo cual se obtuvo la necesaria licencia, y que ofrecía también al público un servicio de publicidad comercial mediante paga. No hay duda que la propiedad se dedicó en parte al propósito igualmente deseado de que produjera un beneficio pecuniario a su dueña por las razones que obligaban a ello.

El caso de *Club Yaucano* en que principalmente ha descansado la Sala sentenciadora para sostener la exención es distinguible, por razón de sus hechos distintos a los del presente caso. Exponiendo la cuestión litigiosa ahí realmente envuelta dijimos: (83 D.P.R. a la pág. 631) "El Tribunal recurrido concluyó que la apelante no podía reclamar exención para su edificio porque, aunque se organizó como una asociación sin fines pecuniarios, *'la forma en que se estructuró a sí misma y estableció su funcionamiento*, permite y da lugar a que la propiedad sobre la cual se pide exención sea usada, o resulte ser usada, para beneficio personal [de algunos de sus miembros].' Para llegar a esta determinación hizo un cuidadoso estudio del reglamento y las cláusulas de incorporación del Club Yaucano, especialmente las relacionadas con una posible liquidación de la asociación" . . . "Sin embargo, no creemos que a los fines de resolver sobre el derecho a la exención sea necesario. *proyectar los hechos hacia el futuro y derivar las posibles consecuencias de una liquidación*, sino que es preciso considerar si la situación a la fecha en que se impuso la contribución sostiene que el

edificio se utilizaba para fines exclusivos de la asociación y si este uso redundaba *en beneficio económico para la asociación* o de alguno de sus miembros en particular. [Cita.] La *prueba*, a nuestro juicio, requiere que ambas proposiciones se contesten *en la negativa*. Los testimonios de los señores Julio C. Torres y Francisco Lluch establecieron que el edificio no ha sido arrendado ni utilizado por personas particulares, y 'que no haya sido para el uso de socios'; que los salones y facilidades recreativas no se ceden a personas que no sean socios; y que es condición indispensable ser socio para poder utilizar el edificio". . . . Más adelante, a la pág. 634, dijimos que según lo entendió el Secretario de Hacienda "la controversia de hecho se limitaba a determinar si los salones y facilidades del edificio del Club Yaucano *se cedían a personas particulares, mediante pago*; y como hemos visto, la única prueba que se aportó no sostiene la contención del Secretario de Hacienda." (Énfasis ahora.) El caso del *Club Yaucano* se decide a tenor de esos hechos expuestos y lo que ahora resolvemos conforme a los de este caso no está en conflicto con esa decisión. Tampoco tienen aplicación criterios como los de *Trinidad* v. *Sagrada Orden,* 263 U.S. 578, en que también descansó la Sala sentenciadora, y casos similares citados por la demandante. En el de *Sagrada Orden* el estatuto eximía de tributo el *ingreso neto* de una corporación, entre otras, organizada y operada exclusivamente para fines religiosos en que ninguna parte de dicho ingreso neto pasara a un accionista o individuo particular. Aceptándose que la Sagrada Orden funcionaba con fines religiosos, caritativos y educativos se atacó la sentencia que concedió la exención porque la Orden también operaba con fines y propósitos comerciales en el sentido de que usaba su propiedad para producir ingreso y comerciaba en vinos, chocolate y otros artículos. Al sostener la sentencia el Tribunal Supremo dijo que el estatuto aplicable reconocía que una corporación podía organizarse y funcionar exclusiva-

mente con fines religiosos y aun así tener un ingreso *neto*, y que el estatuto nada mencionaba sobre la fuente del ingreso pero sí hacía el destino de éste el criterio final de la exención. Expuesto de otra manera, se sostuvo que la organización podía disponer y hacer uso de su propiedad en forma que le produjera ingresos netos sin que por ello dejara de ser una con fines exclusivamente religiosos. Es un hecho de general conocimiento que hay instituciones religiosas, caritativas y culturales que acumulan riquezas producidas mediante el uso y disposición de sus bienes, y no por ello se alteran sus fines y propósitos. Aun así, y a pesar de que no se consideró ser un factor pertinente, el Tribunal apuntó que las transacciones en vinos, chocolate y otros artículos realizadas por la Orden no equivalían a que ella se dedicara al comercio propiamente. No se imputaba, se observa, que se realizaran *ventas al público o en competencia con otros*, sino que eran artículos comprados y suministrados para uso dentro de la propia organización y de sus agencias, muchos de ellos de uso estrictamente religioso, y el hecho de que dejaran alguna ganancia era un factor insignificante.

El caso de la *Sagrada Orden* y otros semejantes, por ejemplo, *Debs Memorial Radio Fund* v. *Commissioner of Int. Rev.*, 148 F.2d 948 (2d Cir. 1945); *Commissioner of Internal Revenue* v. *Battle Creek*, 126 F.2d 405 (5th Cir. 1942), son característicos de esas situaciones en que la exención se concede a la entidad u organización en sí por razón de sus fines no pecuniarios y del tipo de actividades a que se dedica y en donde no hay impedimento de ley a que la organización utilice y disponga de sus bienes de modo que le produzcan beneficios o lucro a ella, de ordinario, siempre que tal lucro no pase a manos particulares. Así en *Debs Memorial*, una corporación organizada para la radiodifusión de programas educativos, cívicos y culturales, se sostuvo que el hecho de que obtuviera una porción sustancial de sus ingresos de la transmisión comercial a la cual dedicaba una parte

del tiempo no destruía su condición de ser una entidad cívica dedicada exclusivamente al bienestar social, bajo disposiciones de la Ley de Rentas Internas federal que concedía exención de la contribución sobre las ganancias a una organización cívica no pecuniaria dedicada a tal fin. En parecida forma nuestra propia Ley de Contribuciones sobre Ingresos declara exentas de esta contribución las corporaciones creadas y administradas exclusivamente para fines religiosos, caritativos, científicos, literarios o educativos . . . ninguna parte de cuyas *utilidades netas* redunde en beneficio de algún accionista o individuo particular. Ley Núm. 91 de 29 de junio de 1954, Sec. 101, 13 L.P.R.A. sec. 3101. Ante este tipo de estatutos tendría exención la demandante que no ha dejado por ello de ser una institución educativa sin fines pecuniarios. La exención aplicable, dirigida a la propiedad con las limitaciones que impone en su utilización y no a su dueño, requiere aquí un dictamen distinto. Se distingue también el caso de aquellas exenciones reconocidas por las cortes a dormitorios, comedores, cafeterías de un colegio o universidad para uso exclusivo de sus estudiantes sin que se admita al público, bajo el criterio de que la función es necesaria para llevar a cabo la enseñanza. Cf. *Pace College* v. *Boyland,* 151 N.E.2d 900 (N.Y.), y autoridades discutidas en la Monografía que le sigue en 72 A.L.R.2d 521.

■ Finalmente, nos referimos a la enmienda al Art. 291 (e) por la Ley Núm. 2 de 11 de marzo de 1963, invocada por la demandante. Aparte de que dicha enmienda no rige para una imposición contributiva del año 1960–61 por no disponer de efecto retroactivo, la misma no anula el principio en sí sostenido en el caso de la *Cámara de Comercio,* antes citado. Más bien reafirma en derecho esa decisión y la norma de ley que la produjo. Sólo que con la enmienda el Legislador autoriza ahora una tributación parcial o proporcional al uso, cosa ésta que el Tribunal no estaba facultado para hacerlo por la vía judicial al resolver dicho caso. Cf.

*State* v. *Bridges,* antes citado y discusión que le sigue en 159 A.L.R. 685. La enmienda cubre el caso "de que parte de la propiedad no la ocupare la organización o institución para sus fines y propósitos no pecuniarios o que parte de la propiedad estuviere *arrendada y produciendo un beneficio pecuniario,* ya al arrendador, ya al arrendatario", esa parte así utilizada está sujeta a la imposición contributiva. Aun cuando pudiéramos aplicar la enmienda de 1963, en las circunstancias particulares de este caso no tendríamos el necesario mecanismo, en ausencia de una reglamentación administrativa o de ley, para determinar qué parte habría de tributar o no, ya que la misma propiedad y equipo se utiliza para uno u otro tipo de radiodifusión.

*Se revocará la sentencia y se dictará otra declarando sin lugar la demanda de devolución de contribuciones.*